### SECOND RUSSIAN INS. CO. v. MILLER, Alien Property Custodian, et al.

(Circuit Court of Appeals, Second Circuit. February 4, 1924.)

No. 148.

1. **International law ⬦⇒7—Russian ukase held not to terminate contract between German and American concerns.**

The Russian ukase of October 29, 1916, declaring contracts between Russian and German subjects canceled and commercial intercourse prohibited, *held* not to terminate a contract between a concern in New York and one in Germany acting as agents for a Russian insurance company; a decree of a sovereignty being local, and not extending beyond its territorial limits.

2. **International law ⬦⇒7—Sovereignty does not exist where not supreme.**

Sovereignty does not exist where it is not supreme.

3. **International law ⬦⇒10—Nature and definition of "comity."**

"Comity," in the legal sense, is neither a matter of absolute obligation on the one hand nor a mere courtesy and good will on the other, and where a comity is extended to the laws of another sovereignty it is a recognition one nation allows within its territory to the legislative, executive, or judicial acts of another nation, and every nation must be the final judge for itself of the nature and extent of its duties on the occasions on which its exercise may be justly demanded.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Comity.]

4. **War ⬦⇒10(1)—Effect of declaration on contracts and commercial intercourse.**

Declaration of war between nations prohibits the making of contracts between citizens of the belligerent nations, and commercial intercourse is unlawful, and executory contracts, which necessarily involve intercourse, and thereby tend to give aid and comfort to the enemy, are dissolved and terminated.

5. **War ⬦⇒10(1)—Effect as terminating agency.**

Breaking out of war does not necessarily and as a matter of law revoke an agency, but its effect depends on the nature and character of the agency, and where a New York corporation was agent of a German partnership, which represented a Russian insurance company, the agency existing between the corporation and the partnership was not voided by the war between Germany and Russia.

Appeal from the District Court of the United States for the Southern District of New York.

---

⬦⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Bill in equity, pursuant to section 9 of the Trading with the Enemy Act (Comp. St. Ann. Supp. 1919, § 3115½e), by the Second Russian Insurance Company against Thomas W. Miller, Alien Property Custodian, and others, to recover moneys held by the Alien Property Custodian. Decree for defendants. Complainant appeals. Affirmed.

Towne & Bailey, of New York City (William S. Thomson and Albert Massey, both of New York City, of counsel), for appellant.

Hartwell Cabell, of New York City (B. F. Sturgis, of New York City, of counsel), for H. Mutzenbecher, Jr.

William Hayward, U. S. Sol., of New York City, and John Neville Boyle, of New York City, Sp. Counsel, for appellees Alien Property Custodian and Treasurer of the United States.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. The appellant appeals from a decree of the District Court denying the relief asked for in this suit in equity under section 9 of the Trading with the Enemy Act (Act Oct. 6, 1917, 40 Stat. 419 [Comp. St. Ann. Supp. 1919, § 3115½e]). The appellant, a Russian corporation, in 1913 established an office for the conduct of its American insurance business in the state of New York. It complied with the statutes of that state and deposited with the New York Life Insurance & Trust Company, as trustee under a trust deed, $200,000 in currency and securities, which it increased from time to time. The Alien Property Custodian served upon Meinel & Wemple, Inc., the agent of the appellant in the United States, and upon the trustee, a demand that the trustee pay over to him the sum of $15,801.31, claiming this was due and payable to him and held by the trustee for the benefit of H. Mutzenbecher, Jr., of Hamburg, Germany. This latter firm was an ememy not holding a license granted by the President. This sum was 3½ per cent. commission upon the gross premium receipts from the reinsurance business done by the appellant during the period from October 31, 1916, to July 1, 1918, after deducting therefrom three-fourths of 1 per cent. of gross premiums, plus certain expenses and charges of Meinel & Wemple, Inc., the resident agent of H. Mutzenbecher, Jr. The money was paid under protest. Thereupon this suit was instituted.

H. Mutzenbecher, Jr., is a copartnership, and filed an answer making claim to the moneys. The business in question was that of reinsurance and H. Mutzenbecher, Jr., were reinsurance agents having their principal office in Hamburg, Germany, and representing a large number of fire insurance companies, including the appellants, as a member of a pool formed by the companies for the purpose of sharing certain United States business. Meinel & Wemple, Inc., is a New York corporation, and represent as agents several of the fire insurance companies which entered this pool. It was in 1913 that Meinel & Wemple, Inc., through H. Mutzenbecher, Jr., was made the United States agent for the appellant. Until January 1, 1915, Meinel & Wemple, Inc., collected all premiums arising out of the United States business and sent them to H. Mutzenbecher, Jr., at Hamburg. Thereupon H. Mutzenbecher, Jr.,

remitted to Meinel & Wemple, Inc., its commissions. After January 1, 1915, no remittances were made until January 1, 1916, when Meinel & Wemple, Inc., began to remit to H. Mutzenbecher, Jr , 2½ per cent. commission and kept its own commissions and expenses, and this continued until November 22, 1916. The Alien Property Custodian contends that H. Mutzenbecher, Jr , are entitled to some commissions, and, having been paid commissions on gross premiums up to and including October, 1916, continue to be entitled to such commissions during the period from October 31, 1916, to July 1, 1918, and for that reason he seized the funds in question.

The reinsurance business of H. Mutzenbecher, Jr., extended throughout the world, they having various subagents. In addition to Meinel & Wemple, Inc., they were represented in New York by Mutzenbecher & Ballard. After the World War, the latter firm changed its name to Sumner, Ballard & Co. Nearly all the stock of this company was owned by H. Mutzenbecher, Jr., and four of its directors resided in Hamburg. The record establishes that after the commencement of the war, and up to the early part of 1917, the business which had theretofore been conducted by them in the United States for the several companies, continued as theretofore with little change, but the exigencies of the World War gave rise to a very efficient blockade of German ports by the Allied fleets and made communication between the United States and Germany difficult and uncertain. Therefore, by agreement, the subagents in the United States deducted and retained their part; H. Mutzenbecher, Jr.'s, part was remitted by wireless to Hamburg. This continued until the United States entered the war. In October, 1916, the Russian government promulgated a ukase, by terms of which contracts between Russian and German subjects were declared to be canceled and commercial intercourse prohibited under penalties. After the decree, an agency contract was forwarded by the appellant to Meinel & Wemple, Inc. The same kind of contract was forwarded to the same agency by H. Mutzenbecher, Jr., for other foreign insurance companies. The question is presented here as to whether this transfer of agency from H. Mutzenbecher, Jr., to Meinel & Wemple, Inc , was in good faith and intended as a bona fide transfer of agency, or whether it was colorable and intended merely to cover up its continued business relations with a pretense that there was a termination of the H. Mutzenbecher, Jr., agency.

Below, the Alien Property Custodian and the Treasurer of the United States, together with H. Mutzenbecher, Jr., claimed that the agency transfer was not bona fide, but was taken to avoid steps which had been taken by Russia to put an end to commercial intercourse between subjects and citizens of that country and subjects and citizens of Germany. The court below found the facts as thus contended for, and that, after the declaration of war by the United States with the passage of the Trading with the Enemy Act, the property of H. Mutzenbecher, Jr., belonging to an alien, was subject to seizure by the custodian. After the establishment of the subagencies here, they, with the assistance of H. Mutzenbecher, Jr., solicited reinsurance treaties with various companies direct, and wrote insurance for both American and foreign firms who

were doing business in the United States. After a treaty was secured, the treaty company proceeded to report to the subagent upon Bordeaux; the individual cessions showing the name of the assured, the amount of the cession, rate of premium, and location of property. These were forwarded by the subagent to H. Mutzenbecher, Jr., at Hamburg. The subagents kept the accounts of the United States branch upon data forwarded from Hamburg, where the principal books were kept, looked after the trust funds in this country, which were in charge of statutory trustees, and drew up the reports required by law to be made for each company to the insurance officials in each state in which the company was authorized to do business.

Until the beginning of the war, the premiums collected from the direct writing companies under the treaties of reinsurance were deposited in the bank accounts of the several companies in this country, who held them or remitted them under instructions from H. Mutzenbecher, Jr., in Hamburg. After the commencement of the war, this duty was changed to the extent that under instructions from H. Mutzenbecher, Jr., and with the consent of the several companies, the subagents here deducted a certain part of the commissions due H. Mutzenbecher, Jr., under the contracts between that firm and the several insurance companies, and, after deducting their expenses and commissions due them under their contract with H. Mutzenbecher, Jr., they dealt with the insurance in accordance with instructions received from Hamburg, in some instances remitting it by cable or wireless, and in others depositing it in special accounts in this country. It was at Hamburg that the business was mapped and carded, and retrocessions were attended to, and all accounts of the companies with respect to their American business were kept. The business of the pool was carried on there. This pool arrangement provided that all the business was pooled, and each company and partner in the pool received a fixed percentage of the whole The profits and losses were shared accordingly.

At the commencement of the war this business arrangement was not materially changed, but, when interference came by the British censorship, H. Mutzenbecher, Jr., appointed a mail agent in Holland, but the first material change came with the Russian ukase of October 29, 1916. Theretofore the Russian law only prohibited payments by a Russian to enemy subjects, and insurance companies paid German firms out of funds which they had at their disposal abroad. This practice was changed after the Russian ukase. After that, Russian insurance companies with German connections were under close governmental supervision. Inspectors were placed in the office, and outgoing communications were required to be submitted for approval. It was then that the agency contracts to Meinel & Wemple, Inc., here considered, were sent out. There was an acceptance of this form of agency in the form of a letter reading:

"We accept the conditions of this agreement, and agree to fulfill all our obligations under the above-mentioned conditions, and to comply with all your instructions regarding the manner in which your business is to be conducted."

Thereafter the mapping, carding, and retroceding of this business was never performed by Meinel & Wemple, Inc , in New York, and one of the members of this firm admitted it could not be done in this country. It is clear that H. Mutzenbecher, Jr., through their mail agent, Clausen, in Holland, thereafter were receiving accounts, loss notices, map corrections, and reports as to trustees' funds and investments, just as they had been receiving theretofore. Meinel & Wemple, Inc., under the contract with appellant, were entitled to 3½ per cent. commission, but they continued to retain for themselves three-fourths of 1 per cent. plus their expenses, and segregated the balance of the commissions deducted above, in a suspense account carried in another bank under their name. It is clear that the intention of the parties was to meet the requirements of the Russian officials and at the same time to permit H. Mutzenbecher, Jr., to continue the business and to obtain their part out of the United States funds of the appellant. Thus the first Russian ukase was met by the arrangement whereby the company could pay H. Mutzenbecher, Jr., not direct from Petrograd, but by New York out of the United States funds. The second ukase was met by Meinel & Wemple, Inc., with full authority as agents, arranging for H. Mutzenbecher, Jr., to continue their work, and being paid out of the commissions allowed to Meinel & Wemple, Inc., under the colorable agency contract.

The contract of October 31, 1916, provided that all insurance and retrocession treaties be submitted to the appellant for approval, and should not be binding until such approval, and—

"In remuneration for all the treaties acquired by you for us, and for the work done by you as our representative according to article II, we will pay you a commission of three and one-half per cent. (3½%) of the annual net premiums resulting from such treaties," etc.

[1, 2] We cannot agree with the argument of the appellant that this agreement with Meinel & Wemple, Inc., covered only business then and thereafter prosecuted through Meinel & Wemple, Inc. On the contrary, we are satisfied the parties intended to carry on the former business with H. Mutzenbecher, Jr., under the terms of the original contract, cloaked or covered by subagency for the purpose of avoiding the Russian ukase. The various business activities and correspondence between Clausen and Meinel & Wemple, Inc., the method of prosecuting this reinsurance and retrocession business, all lead to this conclusion.

But it is argued that the Russian ukase of October 29, 1916, as a matter of law, terminated the contract and therefore the right of H. Mutzenbecher, Jr., to commissions under its contract with the appellant. It is said that by the rules of comity, and under the international law, our courts must give effect to the Russian ukase. It is pointed out that our government and that of Russia occupied the diplomatic status of friendly nations, between which all the principles of comity are operative. The decree of a sovereignty is local, and cannot be extended beyond its territorial limits. Sovereignty does not exist where it is not supreme. Chief Justice Marshall wrote in Rose v. Himely, 4 Cranch, 241, 2 L. Ed. 608:

"It is conceded that the legislation of every country is territorial; that beyond its own territory it can only affect its own subjects or citizens."

As early as 1824, Mr. Justice Story in The Apollon, 9 Wheat. 362, 6 L. Ed. 111, said:

"The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction. And however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction, to places and persons, upon whom the Legislature have authority and jurisdiction."

In 1894 the court again announced in Hilton v. Guyot, 159 U. S. 113, 16 Sup. Ct. 139, 40 L. Ed. 95, that:

"No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived."

[3] The extent to which the law of one nation has been put in force within its territory, whether by executive order or legislative act or judicial decree, and shall be allowed to operate within the domain of another nation, depends upon the comity of nations. The Russian ukase can have no force or effect in the United States, unless our courts, in applying the principle of comity of nations, give it such an effect. It may, of course, be fully effective in Russia. Comity, in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will on the other. Where a comity is extended to the laws of another sovereignty, it is a recognition one nation allows within its territory to the legislative, executive, or judicial acts of another nation. But it has due regard to the international duty and convenience, as well as the rights of its own citizens, or other inhabitants or persons who are under the protection of its laws. Every nation must be the final judge for itself of the nature and extent of its duties on the occasions on which its exercise may be justly demanded. Story on Conflict of Laws, § 63. In Bank of Augusta v. Earle, 13 Pet. 519, 598 (10 L. Ed. 274), Chief Justice Taney wrote for the Supreme Court, saying:

"It is needless to enumerate here the instances in which, by the general practice of civilized countries, the laws of the one will, by the comity of nations, be recognized and executed in another, where the right of individuals are concerned. * * * The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered, and is inadmissible, when contrary to its policy or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong, that courts of justice have continually acted upon it, as a part of the voluntary law of nations."

It is not the comity of the courts, but the comity of the nation, which is demonstrated and asserted in the same way and guided by the same reasoning by which all other principles of municipal law are asserted and guided. Story on Conflict of Laws, § 38. To give the effect to the Russian ukase canceling and terminating the contract in question would be the refusal of our courts to follow the policies and principles of our legislative and judicial departments of government. The purpose of the Trading with the Enemy Act, with the creation of the Alien Property Custodian, was to seize such alien enemy-owned property as is involved here.

[4] The declaration of war between nations prohibits the making of contracts between citizens of the belligerent nations. Commercial intercourse with inhabitants of enemy territory is, during the war, unlawful. So executory contracts between citizens of different countries at war, which necessarily involve intercourse and thereby tend to give aid and comfort to the enemy, are dissolved and terminated. In Williams v. Paine, 169 U. S. 55, 18 Sup. Ct. 279, 42 L. Ed. 658, Mr. Justice Peckham said that the law of nations prohibits all intercourse between citizens of two belligerent nations which is inconsistent with the state of war between the countries, and this includes any act of voluntary submission to the enemy, or receiving his protection, as well as any act or contract which tends to increase his resources, and every kind of trade or commercial dealing or intercourse, whether the transmission of money or goods or orders for delivery of either between the two countries, directly or indirectly, or through the intervention of third parties by contracts in any form looking to or involving such transactions, or by insurances upon trade with or by the enemy.

[5] The agency which we find to exist between H. Mutzenbecher, Jr., and Meinel & Wemple, Inc., was not voided by the war. The breaking out of war does not necessarily and as a matter of law revoke every agency. Whether it is revoked or not depends upon the circumstances surrounding the case and the nature and character of the agency. Williams v. Paine, supra.

We are referred to New York Life Ins. Co. v. Davis, 95 U. S. 429, 24 L. Ed. 453, as a controlling authority. There the decision rests on the ground that the agency was neither consented to nor ratified by the principal, and it was pointed out that, where it is plainly against the interest of the principal that the agency should continue, or where its continuance would impose some new obligation or burden, the assent of the principal to the continuance of the agency after the war broke out will not be presumed, but must be proved either by subsequent revocation or in some other manner. But it is said that, where it is the manifest interest of the principal that the agency constituted before the war should continue, the assent of the principal will be presumed. If the agent continues to act as such, and his so acting is subsequently ratified by the principal, then those acts are just as valid and binding upon the principal as if no war had intervened.

In the instant case, it was very evident that the principal (appellant) was benefited by the contract. Its desire and anxiety that the contract continue is evidenced by its conduct after October 29, 1916. If it be assumed that the ukase in Russia had the effect of terminating the contract, as claimed by the appellant, it does not accord with the principle of our legislative and public policy, and it is not entitled to recognition upon the principle of comity. We are referred to Canada Southern Co. v. Gebhard, 109 U. S. 527, 3 Sup. Ct. 363, 27 L. Ed. 1020, as to the power of a government over contracts of its subjects, where there is no constitutional prohibition against the impairment of the obligation of contracts. The plaintiff purchased bonds of a Canadian railroad corporation payable in New York, where they were delivered to the purchaser. The bonds were secured by a mortgage on the railroad prop-

erty. The company became financially involved, and arrangement was worked out by which new bonds secured by a first mortgage were offered for the old, dollar for dollar of principal, but without accounting for past-due interest. This was assented to by a majority of the holders of bonds, but not by the plaintiff and others. The Canadian Parliament passed an act making the arrangement binding upon all owners of bonds, including plaintiff. The suit was on past-due coupons.

The question was whether the act was binding on the nonassenting bondholders, and whether the courts here should give the effect the Canadian courts gave to it in upholding the act. The act was held to be valid and binding within Canada. The court held that, under these circumstances, the spirit of international comity required the bonds, legalized at home, should be recognized in other countries. The fact that the bonds made in Canada were payable in New York was held to be unimportant, except in determining by what law the parties intended their contract should be covered, and that every citizen of a country other than that in which the corporation is located may protect himself against all unjust legislation of the foreign government by refusing to deal with its corporation. The court likened the Canadian act to our own Bankruptcy Acts, and recognized that the statute did not offend against the public policy of our country. In Oetjen v. Central Leather Co., 246 U. S. 297, 38 Sup. Ct. 309, 62 L. Ed. 726, the court gave effect to the lawful seizure of property made in Mexico. The right of seizure of alien enemy property during a state of war is now recognized by all governments. Thus recognizing a valid seizure in a foreign country did not offend the public policy of our own government.

We conclude that the Russian ukase had no extraterritorial effect, and did not operate as a cancellation of the contract. The moneys in question are satisfactorily shown to be the property of an enemy, and therefore subject to seizure by the Alien Property Custodian.

Decree affirmed.

ROGERS, Circuit Judge, concurs in the result.