# BANCO NACIONAL DE CUBA *v.* SABBATINO, RECEIVER, ET AL.

No. 16.   Argued October 22–23, 1963.—Decided March 23, 1964.

*Victor Rabinowitz* argued the cause for petitioner. With him on the briefs was *Leonard B. Boudin.*

*C. Dickerman Williams* argued the cause and filed briefs for respondent Farr, Whitlock & Co.

*Deputy Attorney General Katzenbach,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Cox, Morton Hollander, John C. Eldridge* and *Andreas F. Lowenfeld.*

*James A. Dixon* filed a brief for the Pan-American Life Insurance Co., as *amicus curiae,* urging reversal.

*Whitney North Seymour* argued the cause for Compania Azucarera Vertientes-Camaguey de Cuba, as *amicus curiae,* urging affirmance. With him on the brief were *Eastman Birkett, John A. Guzzetta* and *Thomas W. Cashel.*

Briefs of *amici curiae,* urging affirmance, were filed by *Charles S. Rhyne, Churchill Rodgers, Max Chopnick, Benjamin Busch, Nicholas R. Doman* and *Leo M. Drachsler* for the American Bar Association; by *Pieter J. Kooiman, Myres S. McDougal* and *Cecil J. Olmstead* for the Executive Committee of the American Branch of the International Law Association; by *Herbert Brownell, James M. Edwards* and *Jack P. Jefferies* for the Committee on International Law of the Association of the Bar of the City of New York; and by *John Lord O'Brian, John G. Laylin, Brice M. Clagett* and *Ky P. Ewing, Jr.* for North American Sugar Industries, Inc., et al.

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question which brought this case here, and is now found to be the dispositive issue, is whether the so-called act of state doctrine serves to sustain petitioner's claims in this litigation. Such claims are ultimately founded on a decree of the Government of Cuba expropriating certain

property, the right to the proceeds of which is here in controversy. The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.

## I.

In February and July of 1960, respondent Farr, Whitlock & Co., an American commodity broker, contracted to purchase Cuban sugar, free alongside the steamer, from a wholly owned subsidiary of Compania Azucarera Vertientes-Camaguey de Cuba (C. A. V.), a corporation organized under Cuban law whose capital stock was owned principally by United States residents. Farr, Whitlock agreed to pay for the sugar in New York upon presentation of the shipping documents and a sight draft.

On July 6, 1960, the Congress of the United States amended the Sugar Act of 1948 to permit a presidentially directed reduction of the sugar quota for Cuba.[1] On the same day President Eisenhower exercised the granted power.[2] The day of the congressional enactment, the Cuban Council of Ministers adopted "Law No. 851," which characterized this reduction in the Cuban sugar quota as an act of "aggression, for political purposes" on the part of the United States, justifying the taking of countermeasures by Cuba. The law gave the Cuban President and Prime Minister discretionary power to nationalize by forced expropriation property or enterprises in which American nationals had an interest.[3] Al-

---

[1] 74 Stat. 330.

[2] Proclamation No. 3355, 74 Stat. c72, effective upon publication in the Federal Register, July 8, 1960, 25 Fed. Reg. 6414.

[3] "WHEREAS, the attitude assumed by the government and the Legislative Power of the United States of North America, which constitutes an aggression, for political purposes, against the basic interests of the Cuban economy, as recently evidenced by the Amendment to the Sugar Act just enacted by the United States Congress at

though a system of compensation was formally provided, the possibility of payment under it may well be deemed illusory.[4] Our State Department has described the Cuban law as "manifestly in violation of those principles

the request of the Chief Executive of that country, whereby exceptional powers are conferred upon the President of the United States to reduce the participation of Cuban sugars in the American sugar market as a threat of political action against Cuba, forces the Revolutionary Government to adopt, without hesitation, all and whatever measures it may deem appropriate or desirable for the due defense of the national sovereignty and protection of our economic development process.

.          .          .          .          .

"WHEREAS, it is advisable, with a view to the ends referred to in the first Whereas of this Law, to confer upon the President and Prime Minister of the Republic full authority to carry out the nationalization of the enterprises and property owned by physical and corporate persons who are nationals of the United States of North America, or of enterprises which have majority interest or participations in such enterprises, even though they be organized under the Cuban laws, so that the required measures may be adopted in future cases with a view to the ends pursued.

"Now, THEREFORE: In pursuance of the powers vested in it, the Council of Ministers has resolved to enact and promulgate the following

"LAW No. 851

"ARTICLE 1. Full authority is hereby conferred upon the President and the Prime Minister of the Republic in order that, acting jointly through appropriate resolutions whenever they shall deem it advisable or desirable for the protection of the national interests, they may proceed to nationalize, through forced expropriations, the properties or enterprises owned by physical and corporate persons who are nationals of the United States of North America, or of the enterprises in which such physical and corporate persons have an interest, even though they be organized under the Cuban laws." Record, at 98–99.

[4] See id., Articles 4–7. Payment for expropriated property would consist of bonds with terms of at least 30 years and bearing 2% annual interest. The interest was not to be cumulative from year to year and was to be paid only out of 25% of the yearly foreign

of international law which have long been accepted by the free countries of the West. It is in its essence discriminatory, arbitrary and confiscatory."[5]

Between August 6 and August 9, 1960, the sugar covered by the contract between Farr, Whitlock and C. A. V.[6] was loaded, destined for Morocco, onto the S. S. *Hornfels*, which was standing offshore at the Cuban port of Jucaro (Santa Maria). On the day loading commenced, the Cuban President and Prime Minister, acting pursuant to Law No. 851, issued Executive Power Resolution No. 1. It provided for the compulsory expropriation of all property and enterprises, and of rights and interests arising therefrom, of certain listed companies, including C. A. V., wholly or principally owned by American nationals. The preamble reiterated the alleged injustice of the American reduction of the Cuban sugar quota and emphasized the importance of Cuba's serving as an example for other countries-to follow "in their struggle to free themselves from the brutal claws of Imperialism."[7] In consequence

---

exchange received by sales of Cuban sugar to the United States in excess of 3,000,000 Spanish long tons at a minimum price of 5.75 cents per English pound. (In the preceding 10 years the annual average price had never been that high and in only one of those years had as many as 3,000,000 Spanish long tons been sold, 307 F. 2d, at 862.) The bonds were to be amortized only upon the authority of the President of the National Bank. The President and Prime Minister of the Cuban state were empowered to choose the appraisers. It is not clear whether the bonds were to be paid at maturity if funds were insufficient at that time.

[5] See State Dept. Note No. 397, July 16, 1960 (to Cuban Ministry of Foreign Relations).

[6] The parties have treated the interest of the wholly owned subsidiary as if it were identical with that of C. A. V.; hence no distinction between the two companies will be drawn in the remainder of this opinion.

[7] "WHEREAS, the attitude assumed by the Government and the Legislative Power of the United States of North America, of continued aggression, for political purposes, against the basic interests

of the resolution, the consent of the Cuban Government was necessary before a ship carrying sugar of a named company could leave Cuban waters. In order to obtain this consent, Farr, Whitlock, on August 11, entered into contracts, identical to those it had made with C. A. V.,

---

of the Cuban economy, as evidenced by the amendment to the Sugar Act adopted by the Congress of said country, whereby exceptional powers were conferred upon the President of said nation to reduce the participation of Cuban sugars in the sugar market of said country, as a weapon of political action against Cuba, was considered as the fundamental justification of said law.

"WHEREAS, the Chief Executive of the Government of the United States of North America, making use of said exceptional powers, and assuming an obvious attitude of economic and political aggression against our country, has reduced the participation of Cuban sugars in the North American market with the unquestionable design to attack Cuba and its revolutionary process.

"WHEREAS, this action constitutes a reiteration of the continued conduct of the government of the United States of North America, intended to prevent the exercise of its sovereignty and its integral development by our people thereby serving the base interests of the North American trusts, which have hindered the growth of our economy and the consolidation of our political freedom.

"WHEREAS, in the face of such developments the undersigned, being fully conscious of their great historical responsibility and in legitimate defense of the national economy are duty bound to adopt the measures deemed necessary to counteract the harm done by the aggression inflicted upon our nation.

.          .          .          .          .

"WHEREAS, it is the duty of the peoples of Latin America to strive for the recovery of their native wealth by wresting it from the hands of the foreign monopolies and interests which prevent their development, promote political interference, and impair the sovereignty of the underdeveloped countries of America.

"WHEREAS, the Cuban Revolution will not stop until it shall have totally and definitely liberated its fatherland.

"WHEREAS, Cuba must be a luminous and stimulating example for the sister nations of America and all the underdeveloped countries of the world to follow in their struggle to free themselves from the brutal claws of Imperialism.      [Footnote 7 continued on p. 405]

with the Banco Para el Comercio Exterior de Cuba, an instrumentality of the Cuban Government. The S. S. *Hornfels* sailed for Morocco on August 12.

Banco Exterior assigned the bills of lading to petitioner, also an instrumentality of the Cuban Government, which instructed its agent in New York, Societe Generale, to deliver the bills and a sight draft in the sum of $175,250.69 to Farr, Whitlock in return for payment. Societe Generale's initial tender of the documents was refused by Farr, Whitlock, which on the same day was notified of C. A. V.'s claim that as rightful owner of the sugar it was entitled to the proceeds. In return for a promise not to turn the funds over to petitioner or its agent, C. A. V. agreed to indemnify Farr, Whitlock for any loss.[8] Farr, Whitlock subsequently accepted the shipping documents, negotiated the bills of lading to its customer, and

"Now, THEREFORE: In pursuance of the powers vested in us, in accordance with the provisions of Law No. 851, of July 6, 1960, we hereby,

"RESOLVE:

"FIRST. To order the nationalization, through compulsory expropriation, and, therefore, the adjudication in fee simple to the Cuban State, of all the property and enterprises located in the national territory, and the rights and interests resulting from the exploitation of such property and enterprises, owned by the juridical persons who are nationals of the United States of North America, or operators of enterprises in which nationals of said country have a predominating interest, as listed below, to wit:

.            .            .            .            .

"22. Compañá Azucarera Vertientes Camagüey de Cuba.

.            .            .            .            .

"SECOND. Consequently, the Cuban State is hereby subrogated in the place and stead of the juridical persons listed in the preceding section, in respect of the property, rights and interests aforesaid, and of the assets and liabilities constituting the capital of said enterprises." Record, at 102–105.

[8] C. A. V. also agreed to pay Farr, Whitlock 10% of the $175,000 if C. A. V. ever obtained that sum. 307 F. 2d, at 851.

received payment for the sugar. It refused, however, to hand over the proceeds to Societe Generale. Shortly thereafter, Farr, Whitlock was served with an order of the New York Supreme Court, which had appointed Sabbatino as Temporary Receiver of C. A. V.'s New York assets, enjoining it from taking any action in regard to the money claimed by C. A. V. that might result in its removal from the State. Following this, Farr, Whitlock, pursuant to court order, transferred the funds to Sabbatino, to abide the event of a judicial determination as to their ownership.

Petitioner then instituted this action in the Federal District Court for the Southern District of New York. Alleging conversion of the bills of lading, it sought to recover the proceeds thereof from Farr, Whitlock and to enjoin the receiver from exercising any dominion over such proceeds. Upon motions to dismiss and for summary judgment, the District Court, 193 F. Supp. 375, sustained federal *in personam* jurisdiction despite state control of the funds. It found that the sugar was located within Cuban territory at the time of expropriation and determined that under merchant law common to civilized countries Farr, Whitlock could not have asserted ownership of the sugar against C. A. V. before making payment. It concluded that C. A. V. had a property interest in the sugar subject to the territorial jurisdiction of Cuba. The court then dealt with the question of Cuba's title to the sugar, on which rested petitioner's claim of conversion. While acknowledging the continuing vitality of the act of state doctrine, the court believed it inapplicable when the questioned foreign act is in violation of international law. Proceeding on the basis that a taking invalid under international law does not convey good title, the District Court found the Cuban expropriation decree to violate such law in three

separate respects: it was motivated by a retaliatory and not a public purpose; it discriminated against American nationals; and it failed to provide adequate compensation. Summary judgment against petitioner was accordingly granted.

The Court of Appeals, 307 F. 2d 845, affirming the decision on similar grounds, relied on two letters (not before the District Court) written by State Department officers which it took as evidence that the Executive Branch had no objection to a judicial testing of the Cuban decree's validity. The court was unwilling to declare that any one of the infirmities found by the District Court rendered the taking invalid under international law, but was satisfied that in combination they had that effect. We granted certiorari because the issues involved bear importantly on the conduct of the country's foreign relations and more particularly on the proper role of the Judicial Branch in this sensitive area. 372 U. S. 905. For reasons to follow we decide that the judgment below must be reversed.

Subsequent to the decision of the Court of Appeals, the C. A. V. receivership was terminated by the State Supreme Court; the funds in question were placed in escrow, pending the outcome of this suit. C. A. V. has moved in this Court to be substituted as a party in the place of Sabbatino. Although it is true that Sabbatino's defensive interest in this litigation has largely, if not entirely, reflected that of C. A. V., this is true also of Farr, Whitlock's position. There is no indication that Farr, Whitlock has not adequately represented C. A. V.'s interest or that it will not continue to do so. Moreover, insofar as disposition of the case here is concerned, C. A. V. has been permitted as *amicus* to brief and argue its position before this Court. In these circumstances we are not persuaded that the admission of C. A. V. as a party is

necessary at this stage to safeguard any claim either that it has already presented or that it may present in the future course of this litigation. Accordingly, we are constrained to deny C. A. V.'s motion to be admitted as a party,[9] without prejudice however to the renewal of such a motion in the lower courts if it appears that C. A. V.'s interests are not adequately represented by Farr, Whitlock and that the granting of such a motion will not disturb federal jurisdiction. Cf. *Strawbridge* v. *Curtiss,* 3 Cranch 267; *Indianapolis* v. *Chase Nat'l Bank,* 314 U. S. 63, at 69; *Ex parte Edelstein,* 30 F. 2d 636, at 638.

Before considering the holding below with respect to the act of state doctrine, we must deal with narrower grounds urged for dismissal of the action or for a judgment on the merits in favor of respondents.

## II.

It is first contended that this petitioner, an instrumentality of the Cuban Government, should be denied access to American courts because Cuba is an unfriendly power and does not permit nationals of this country to obtain relief in its courts. Even though the respondents did not raise this point in the lower courts we think it should be considered here. If the courts of this country should be closed to the government of a foreign state, the underlying reason is one of national policy transcending the interests of the parties to the action, and this Court should give effect to that policy *sua sponte* even at this stage of the litigation.

Under principles of comity governing this country's relations with other nations, sovereign states are allowed

---

[9] Because of C. A. V.'s *amicus* position in this Court, and because its arguments have been presented separately from those of Farr, Whitlock, even though each has adopted the other's contentions, this opinion refers to "respondents" although Farr, Whitlock is the only formal party-respondent.

to sue in the courts of the United States, *The Sapphire,* 11 Wall. 164, 167; *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, 134. This Court has called "comity" in the legal sense "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Hilton* v. *Guyot,* 159 U. S. 113, 163–164. Although comity is often associated with the existence of friendly relations between states, *e. g., Bank of Augusta* v. *Earle,* 13 Pet. 519, 589; *Russian Republic* v. *Cibrario,* 235 N. Y. 255, 258, 139 N. E. 259, 260, prior to some recent lower court cases which have questioned the right of instrumentalities of the Cuban Government to sue in our courts,[10] the privilege of suit has been denied only to governments at war with the United States, *Ex parte Don Ascanio Colonna,* 314 U. S. 510; see § 7 of the Trading with the Enemy Act, 40 Stat. 416, 417, 50 U. S. C. App. § 7; cf. *Hanger* v. *Abbott,* 6 Wall. 532; *Caperton* v. *Bowyer,* 14 Wall. 216, 236, or to those not recognized by this country, *The Penza,* 277 F. 91; *Russian Republic* v. *Cibrario, supra.*[11]

---

[10] In *P & E Shipping Corp.* v. *Banco Para El Comercio Exterior de Cuba,* 307 F. 2d 415 (C. A. 1st Cir.), the court *sua sponte* questioned the right of Cuba to sue. It concluded that the matter was one for the Executive Branch to decide and remanded the case to the District Court to elicit the views of the State Department. The trial court in *Dade Drydock Corp.* v. *The M/T Mar Caribe,* 199 F. Supp. 871 (S. D. Tex.), apparently equated the severance of diplomatic relations with the withdrawal of recognition and suspended the action "until the Government of the Republic of Cuba is again recognized by the United States of America," *id.,* at 874. In two other cases, however, *Pons* v. *Republic of Cuba,* 111 U. S. App. D. C. 141, 294 F. 2d 925; *Republic of Cuba* v. *Mayan Lines, S. A.,* 145 So. 2d 679 (Ct. App., 4th Cir., La.), courts have upheld the right of Cuba to sue despite the severance of diplomatic relations.

[11] The District Court in *The Gul Djemal,* 296 F. 563, 296 F. 567, did refuse to permit the invocation of sovereign immunity by the Turkish Government, with whom the United States had broken

Respondents, pointing to the severance of diplomatic relations, commercial embargo, and freezing of Cuban assets in this country, contend that relations between the United States and Cuba manifest such animosity that unfriendliness is clear, and that the courts should be closed to the Cuban Government. We do not agree. This Court would hardly be competent to undertake assessments of varying degrees of friendliness or its absence, and, lacking some definite touchstone for determination, we are constrained to consider any relationship, short of war, with a recognized sovereign power as embracing the privilege of resorting to United States courts. Although the severance of diplomatic relations is an overt act with objective significance in the dealings of sovereign states, we are unwilling to say that it should inevitably result in the withdrawal of the privilege of bringing suit. Severance may take place for any number of political reasons, its duration is unpredictable, and whatever expression of animosity it may imply does not approach that implicit in a declaration of war.

It is perhaps true that nonrecognition of a government in certain circumstances may reflect no greater unfriendliness than the severance of diplomatic relations with a recognized government, but the refusal to recognize has a unique legal aspect. It signifies this country's unwillingness to acknowledge that the government in question speaks as the sovereign authority for the territory it purports to control, see *Russian Republic* v. *Cibrario, supra,* at 260–263, 139 N. E., at 261–263. Political recognition is exclusively a function of the Executive. The possible incongruity of judicial "recognition," by permitting suit, of a government not recognized by the Executive is com-

diplomatic relations, on the theory that under such circumstances comity did not require the granting of immunity. The case was affirmed, 264 U. S. 90, but on another ground.

pletely absent when merely diplomatic relations are broken.[12]

The view that the existing situation between the United States and Cuba should not lead to a denial of status to sue is buttressed by the circumstance that none of the acts of our Government have been aimed at closing the courts of this country to Cuba, and more particularly by the fact that the Government has come to the support of Cuba's "act of state" claim in this very litigation.

Respondents further urge that reciprocity of treatment is an essential ingredient of comity generally, and, therefore, of the privilege of foreign states to bring suit here. Although *Hilton* v. *Guyot*, 159 U. S. 113, contains some broad language about the relationship of reciprocity to comity, the case in fact imposed a requirement of reciprocity only in regard to conclusiveness of judgments, and even then only in limited circumstances. *Id.*, at 170–171. In *Direction der Disconto-Gesellschaft* v. *United States Steel Corp.*, 300 F. 741, 747 (D. C. S. D. N. Y.), Judge Learned Hand pointed out that the doctrine of reciprocity has apparently been confined to foreign judgments.

---

[12] The doctrine that nonrecognition precludes suit by the foreign government in every circumstance has been the subject of discussion and criticism. See, *e. g.*, Hervey, The Legal Effects of Recognition in International Law (1928) 112–119; Jaffe, Judicial Aspects of Foreign Relations (1933) 148–156; Borchard, The Unrecognized Government in American Courts, 26 Am. J. Int'l L. 261 (1932); Dickinson, The Unrecognized Government or State in English and American Law, 22 Mich. L. Rev. 118 (1923); Fraenkel, The Juristic Status of Foreign States, Their Property and Their Acts, 25 Col. L. Rev. 544, 547–552 (1925); Lubman, The Unrecognized Government in American Courts: Upright v. Mercury Business Machines, 62 Col. L. Rev. 275 (1962). In this litigation we need intimate no view on the possibility of access by an unrecognized government to United States courts, except to point out that even the most inhospitable attitude on the matter does not dictate denial of standing here.

There are good reasons for declining to extend the principle to the question of standing of sovereign states to sue. Whether a foreign sovereign will be permitted to sue involves a problem more sensitive politically than whether the judgments of its courts may be re-examined, and the possibility of embarrassment to the Executive Branch in handling foreign relations is substantially more acute. Re-examination of judgments, in principle, reduces rather than enhances the possibility of injustice being done in a particular case; refusal to allow suit makes it impossible for a court to see that a particular dispute is fairly resolved. The freezing of Cuban assets exemplifies the capacity of the political branches to assure, through a variety of techniques (see *infra*, pp. 431, 435–436), that the national interest is protected against a country which is thought to be improperly denying the rights of United States citizens.

Furthermore, the question whether a country gives *res judicata* effect to United States judgments presents a relatively simple inquiry. The precise status of the United States Government and its nationals before foreign courts is much more difficult to determine. To make such an investigation significant, a court would have to discover not only what is provided by the formal structure of the foreign judicial system, but also what the practical possibilities of fair treatment are. The courts, whose powers to further the national interest in foreign affairs are necessarily circumscribed as compared with those of the political branches, can best serve the rule of law by not excluding otherwise proper suitors because of deficiencies in their legal systems.

We hold that this petitioner is not barred from access to the federal courts.[13]

---

[13] Respondents suggest that suit may be brought, if at all, only by an authorized agent of the Cuban Government. Decisions establishing that privilege based on sovereign prerogatives may be evoked

## III.

Respondents claimed in the lower courts that Cuba had expropriated merely contractual rights the situs of which was in New York, and that the propriety of the taking was, therefore, governed by New York law. The District Court rejected this contention on the basis of the right of ownership possessed by C. A. V. against Farr, Whitlock prior to payment for the sugar. That the sugar itself was expropriated rather than a contractual claim is further supported by Cuba's refusal to let the S. S. *Hornfels* sail until a new contract had been signed. Had the Cuban decree represented only an attempt to expropriate a contractual right of C. A. V., the forced delay of shipment and Farr, Whitlock's subsequent contract with petitioner's assignor would have been meaningless.[14] Neither the District Court's finding concerning the location of the S. S. *Hornfels* nor its conclusion that Cuba had territorial jurisdiction to expropriate the sugar, acquiesced in by the Court of Appeals, is seriously challenged here. Respondents' limited view of the expropriation must be rejected.

Respondents further contend that if the expropriation was of the sugar itself, this suit then becomes one to enforce the public law of a foreign state and as such is not cognizable in the courts of this country. They rely on the principle enunciated in federal and state cases that a

---

only by such agents, *e. g., The Anne,* 3 Wheat. 435; *Ex parte Muir,* 254 U. S. 522, 532–533; *The Sao Vicente,* 260 U. S. 151; *The "Gul Djemal,"* 264 U. S. 90, are not apposite to cases in which a state merely sues in our Courts without claiming any right uniquely appertaining to sovereigns.

[14] If Cuba had jurisdiction to expropriate the contractual right, it would have been unnecessary for it to compel the signing of a new contract. If Cuba did not have jurisdiction, any action which it took in regard to Farr, Whitlock or the sugar would have been ineffective to transfer C. A. V.'s claim.

court need not give effect to the penal or revenue laws of foreign countries or sister states. See, *e. g., The Antelope,* 10 Wheat. 66, 123; *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S. 265; *Huntington* v. *Attrill,* 146 U. S. 657 (all relating to penal laws); [15] *Moore* v. *Mitchell,* 30 F. 2d 600, aff'd on other grounds, 281 U. S. 18; *City of Detroit* v. *Proctor,* 44 Del. 193, 61 A. 2d 412; *City of Philadelphia* v. *Cohen,* 11 N. Y. 2d 401, 184 N. E. 2d 167, 230 N. Y. S. 2d 188 (all relating to revenue laws).

The extent to which this doctrine may apply to other kinds of public laws, though perhaps still an open question,[16] need not be decided in this case. For we have been referred to no authority which suggests that the doctrine reaches a public law which, as here, has been fully executed within the foreign state. Cuba's restraint of the S. S. *Hornfels* must be regarded for these purposes to have constituted an effective taking of the sugar, vesting in Cuba C. A. V.'s property right in it. Farr, Whit-

---

[15] As appears from the cases cited, a penal law for the purposes of this doctrine is one which seeks to redress a public rather than a private wrong.

[16] The doctrine may have a broader reach in Great Britain, see *Don Alonso* v. *Cornero,* Hob. 212a, Hobart's King's Bench Reps. 372; *Banco de Vizcaya* v. *Don Alfonso de Borbon y Austria,* [1935] 1 K. B. 140; *Attorney-General for Canada* v. *William Schulze & Co.,* [1901] 9 Scots L. T. Reps. 4 (Outer House); Dicey's Conflict of Laws, 162 (Morris ed. 1958); Mann, Prerogative Rights of Foreign States and the Conflict of Laws, 40 Grotius Society 25 (1955); but see *Lepage* v. *San Paulo Coffee Estates Co.,* [1917] W. N. 216 (High Ct. of Justice, Ch. Div.); *Lorentzen* v. *Lydden & Co.,* [1942] 2 K. B. 202; *F. & K. Jabbour* v. *Custodian of Israeli Absentee Property,* [1954] 1 Weekly L. R. 139 (Q. B.), than in the United States, cf. *United States* v. *Belmont,* 85 F. 2d 542, rev'd, 301 U. S. 324 (possibility of broad rule against enforceability of public acts not discussed in either court), *United States* v. *Pink,* 284 N. Y. 555, 32 N. E. 2d 552, rev'd, 315 U. S. 203 (same); *Anderson* v. *N. V. Transandine Handelmaatschappij,* 289 N. Y. 9, 43 N. E. 2d 502; but see Leflar, Extrastate Enforcement of Penal and Governmental Claims, 46 Harv. L. Rev. 193, 194 (1932).

lock's contract with the Cuban bank, however compelled to sign Farr, Whitlock may have felt, represented indeed a recognition of Cuba's dominion over the property.

In these circumstances the question whether the rights acquired by Cuba are enforceable in our courts depends not upon the doctrine here invoked but upon the act of state doctrine discussed in the succeeding sections of this opinion.[17]

---

[17] The courts below properly declined to determine if issuance of the expropriation decree complied with the formal requisites of · Cuban law. In dictum in *Hudson* v. *Guestier,* 4 Cranch 293, 294, Chief Justice Marshall declared that one nation must recognize the act of the sovereign power of another, so long as it has jurisdiction under international law, even if it is improper according to the internal law of the latter state. This principle has been followed in a number of cases. See, *e. g., Banco de Espana* v. *Federal Reserve Bank,* 114 F. 2d 438, 443, 444 (C. A. 2d Cir.); *Bernstein* v. *Van Heyghen Freres Societe Anonyme,* 163 F. 2d 246, 249 (C. A. 2d Cir.); *Eastern States Petroleum Co.* v. *Asiatic Petroleum Corp.,* 28 F. Supp. 279 (D. C. S. D. N. Y.). But see *Canada Southern R. Co.* v. *Gebhard,* 109 U. S. 527; cf. *Fremont* v. *United States,* 17 How. 542 (United States successor sovereign over land); *Sabariego* v. *Maverick,* 124 U. S. 261 (same); *Shapleigh* v. *Mier,* 299 U. S. 468 (same). An inquiry by United States courts into the validity of an act of an official of a foreign state under the law of that state would not only be exceedingly difficult but, if wrongly made, would be likely to be highly offensive to the state in question. Of course, such review can take place between States in our federal system, but in that instance there is' similarity of legal structure and an impartial arbiter, this Court, applying the full faith and credit provision of the Federal Constitution.

Another ground supports the resolution of this problem in the courts below. Were any test to be applied it would have to be what effect the decree would have if challenged in Cuba. If no institution of legal authority would refuse to effectuate the decree, its "formal" status—here its argued invalidity if not properly published in the Official Gazette in Cuba—is irrelevant. It has not been seriously contended that the judicial institutions of Cuba would declare the decree invalid.

## IV.

The classic American statement of the act of state doctrine, which appears to have taken root in England as early as 1674, *Blad* v. *Bamfield*, 3 Swans. 604, 36 Eng. Rep. 992, and began to emerge in the jurisprudence of this country in the late eighteenth and early nineteenth centuries, see, *e. g., Ware* v. *Hylton,* 3 Dall. 199, 230; *Hudson* v. *Guestier,* 4 Cranch 293, 294; *The Schooner Exchange* v. *M'Faddon,* 7 Cranch 116, 135, 136; *L'Invincible,* 1 Wheat. 238, 253; *The Santissima Trinidad,* 7 Wheat. 283, 336, is found in *Underhill* v. *Hernandez,* 168 U. S. 250, where Chief Justice Fuller said for a unanimous Court (p. 252):

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

Following this precept the Court in that case refused to inquire into acts of Hernandez, a revolutionary Venezuelan military commander whose government had been later recognized by the United States, which were made the basis of a damage action in this country by Underhill, an American citizen, who claimed that he had been unlawfully assaulted, coerced, and detained in Venezuela by Hernandez.

None of this Court's subsequent cases in which the act of state doctrine was directly or peripherally involved manifest any retreat from *Underhill.* See *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347; *Oetjen* v. *Central Leather Co.,* 246 U. S. 297; *Ricaud* v. *American Metal Co.,* 246 U. S. 304; *Shapleigh* v. *Mier,* 299 U. S.

468; *United States* v. *Belmont,* 301 U. S. 324; *United States* v. *Pink,* 315 U. S. 203. On the contrary in two of these cases, *Oetjen* and *Ricaud,* the doctrine as announced in *Underhill* was reaffirmed in unequivocal terms.

*Oetjen* involved a seizure of hides from a Mexican citizen as a military levy by General Villa, acting for the forces of General Carranza, whose government was recognized by this country subsequent to the trial but prior to decision by this Court. The hides were sold to a Texas corporation which shipped them to the United States and assigned them to defendant. As assignee of the original owner, plaintiff replevied the hides, claiming that they had been seized in violation of the Hague Conventions. In affirming a judgment for defendant, the Court suggested that the rules of the Conventions did not apply to civil war and that, even if they did, the relevant seizure was not in violation of them. 246 U. S., at 301–302. Nevertheless, it chose to rest its decision on other grounds. It described the designation of the sovereign as a political question to be determined by the legislative and executive departments rather than the judicial department, invoked the established rule that such recognition operates retroactively to validate past acts, and found the basic tenet of *Underhill* to be applicable to the case before it.

> "The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign State to be reëxamined and perhaps condemned by

the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'" *Id.,* at 303–304.

In *Ricaud* the facts were similar—another general of the Carranza forces seized lead bullion as a military levy—except that the property taken belonged to an American citizen. The Court found *Underhill, American Banana,* and *Oetjen* controlling. Commenting on the nature of the principle established by those cases, the opinion stated that the rule

"does not deprive the courts of jurisdiction once acquired over a case. It requires only that, when it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision. To accept a ruling authority and to decide accordingly is not a surrender or abandonment of jurisdiction but is an exercise of it. It results that the title to the property in this case must be determined by the result of the action taken by the military authorities of Mexico . . . ." 246 U. S., at 309.

To the same effect is the language of Mr. Justice Cardozo in the *Shapleigh* case, *supra,* where, in commenting on the validity of a Mexican land expropriation, he said (299 U. S., at 471): "The question is not here whether the proceeding was so conducted as to be a wrong to our nationals under the doctrines of international law, though valid under the law of the situs of the land. For wrongs of that order the remedy to be followed is along the channels of diplomacy."

In deciding the present case the Court of Appeals relied in part upon an exception to the unqualified teach-

ings of *Underhill, Oetjen,* and *Ricaud* which that court had earlier indicated. In *Bernstein* v. *Van Heyghen Freres Societe Anonyme,* 163 F. 2d 246, suit was brought to recover from an assignee property allegedly taken, in effect, by the Nazi Government because plaintiff was Jewish. Recognizing the odious nature of this act of state, the court, through Judge Learned Hand, nonetheless refused to consider it invalid on that ground. Rather, it looked to see if the Executive had acted in any manner that would indicate that United States Courts should refuse to give effect to such a foreign decree. Finding no such evidence, the court sustained dismissal of the complaint. In a later case involving similar facts the same court again assumed examination of the German acts improper, *Bernstein* v. *N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij,* 173 F. 2d 71, but, quite evidently following the implications of Judge Hand's opinion in the earlier case, amended its mandate to permit evidence of alleged invalidity, 210 F. 2d 375, subsequent to receipt by plaintiff's attorney of a letter from the Acting Legal Adviser to the State Department written for the purpose of relieving the court from any constraint upon the exercise of its jurisdiction to pass on that question.[18]

---

[18] The letter stated:

"1. This government has consistently opposed the forcible acts of dispossession of a discriminatory and confiscatory nature practiced by the Germans on the countries or peoples subject to their controls.

.     .     .     .     .

"3. The policy of the Executive, with respect to claims asserted in the United States for the restitution of identifiable property (or compensation in lieu thereof) lost through force, coercion, or duress as a result of Nazi persecution in Germany, is to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials." State Department Press Release, April 27, 1949, 20 Dept. State Bull. 592.

This Court has never had occasion to pass upon the so-called *Bernstein* exception, nor need it do so now. For whatever ambiguity may be thought to exist in the two letters from State Department officials on which the Court of Appeals relied,[19] 307 F. 2d, at 858, is now removed by the position which the Executive has taken in this Court on the act of state claim; respondents do not indeed contest the view that these letters were intended to reflect no more than the Department's then wish not to make any statement bearing on this litigation.

The outcome of this case, therefore, turns upon whether any of the contentions urged by respondents against the application of the act of state doctrine in the premises is acceptable: (1) that the doctrine does not apply to acts of state which violate international law, as is claimed to be the case here; (2) that the doctrine is inapplicable unless the Executive specifically interposes it in a particular case; and (3) that, in any event, the doctrine may not be invoked by a foreign government plaintiff in our courts.

---

[19] Abram Chayes, the Legal Adviser to the State Department, wrote on October 18, 1961, in answer to an inquiry regarding the position of the Department by Mr. John Laylin, attorney for *amici:*

"The Department of State has not, in the *Bahia de Nipe* case or elsewhere, done anything inconsistent with the position taken on the Cuban nationalizations by Secretary Herter. Whether or not these nationalizations will in the future be given effect in the United States is, of course, for the courts to determine. Since the *Sabbatino* case and other similar cases are at present before the courts, any comments on this question by the Department of State would be out of place at this time. As you yourself point out, statements by the executive branch are highly susceptible of misconstruction."

A letter dated November 14, 1961, from George Ball, Under Secretary for Economic Affairs, responded to a similar inquiry by the same attorney:

"I have carefully considered your letter and have discussed it with the Legal Adviser. Our conclusion, in which the Secretary concurs, is that the Department should not comment on matters pending before the courts."

## V.

Preliminarily, we discuss the foundations on which we deem the act of state doctrine to rest, and more particularly the question of whether state or federal law governs its application in a federal diversity case.[20]

We do not believe that this doctrine is compelled either by the inherent nature of sovereign authority, as some of the earlier decisions seem to imply, see *Underhill, supra; American Banana, supra; Oetjen, supra,* at 303, or by some principle of international law. If a transaction takes place in one jurisdiction and the forum is in another, the forum does not by dismissing an action or by applying its own law purport to divest the first jurisdiction of its territorial sovereignty; it merely declines to adjudicate or makes applicable its own law to parties or property before it. The refusal of one country to enforce the penal laws of another (*supra,* pp. 413–414) is a typical example of an instance when a court will not entertain a cause of action arising in another jurisdiction. While historic notions of sovereign authority do bear upon the wisdom of employing the act of state doctrine, they do not dictate its existence.

That international law does not require application of the doctrine is evidenced by the practice of nations. Most of the countries rendering decisions on the subject fail to follow the rule rigidly.[21] No international arbitral

---

[20] Although the complaint in this case alleged both diversity and federal question jurisdiction, the Court of Appeals reached jurisdiction only on the former ground, 307 F. 2d, at 852. We need not decide, for reasons appearing hereafter, whether federal question jurisdiction also existed.

[21] In English jurisprudence, in the classic case of *Luther* v. *James Sagor & Co.,* [1921] 3 K. B. 532, the act of state doctrine is articulated in terms not unlike those of the United States cases. See *Princess Paley Olga* v. *Weisz,* [1929] 1 K. B. 718. But see *Anglo-*

422

or judicial decision discovered suggests that international law prescribes recognition of sovereign acts of foreign governments, see 1 Oppenheim's International Law, § 115aa (Lauterpacht, 8th ed. 1955), and apparently no claim has ever been raised before an international tribunal that failure to apply the act of state doctrine constitutes a breach of international obligation. If international law does not prescribe use of the doctrine, neither does it forbid application of the rule even if it is claimed that the act of state in question violated international law. The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another. Because of its peculiar nation-to-nation character the usual method for an individual

*Iranian Oil Co.* v. *Jaffrate*, [1953] 1 Weekly L. R. 246, [1953] Int'l L. Rep. 316 (Aden Sup. Ct.) (exception to doctrine if foreign act violates international law). Civil law countries, however, which apply the rule make exceptions for acts contrary to their sense of public order. See, *e. g., Ropit* case, Cour de Cassation (France), [1929] Recueil Général Des Lois et Des Arrêts (Sirey) Part I, 217; 55 Journal Du Droit International (Clunet) 674 (1928), [1927–1928] Ann. Dig., No. 43; Graue, Germany: Recognition of Foreign Expropriations, 3 Am. J. Comp. L. 93 (1954); Domke, Indonesian Nationalization Measures Before Foreign Courts, 54 Am. J. Int'l L. 305 (1960) (discussion of and excerpts from opinions of the District Court in Bremen and the Hanseatic Court of Appeals in *N. V. Verenigde Deli-Maatschapijen* v. *Deutsch-Indonesische Tabak-Handelsgesellschaft m. b. H.*, and of the Amsterdam District Court and Appellate Court in *Senembah Maatschappij N. V.* v. *Republiek Indonesie Bank Indonesia*); Massouridis, The Effects of Confiscation, Expropriation, and Requisition by a Foreign Authority, 3 Revue Hellénique De Droit International 62, 68 (1950) (recounting a decision of the court of the first instance of Piraeus); *Anglo-Iranian Oil Co.* v. *S. U. P. O. R. Co.*, [1955] Int'l L. Rep. 19 (Ct. of Venice), 78 Il Foro Italiano Part I, 719; 40 Blätter für Zürcherische Rechtsprechung No. 65, 172–173 (Switzerland). See also *Anglo-Iranian Oil Co.* v. *Idemitsu Kosan Kabushiki Kaisha*, [1953] Int'l L. Rep. 312 (High Ct. of Tokyo).

to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal. See *United States* v. *Diekelman,* 92 U. S. 520, 524. Although it is, of course, true that United States courts apply international law as a part of our own in appropriate circumstances, *Ware* v. *Hylton,* 3 Dall. 199, 281; *The Nereide,* 9 Cranch 388, 423; *The Paquete Habana,* 175 U. S. 677, 700, the public law of nations can hardly dictate to a country which is in theory wronged how to treat that wrong within its domestic borders.

Despite the broad statement in *Oetjen* that "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative . . . Departments," 246 U. S., at 302, it cannot of course be thought that "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker* v. *Carr,* 369 U. S. 186, 211. The text of the Constitution does not require the act of state doctrine; it does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of state.

The act of state doctrine does, however, have "constitutional" underpinnings. It arises out of the basic relationships between branches of government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere. Many

commentators disagree with this view;[22] they have striven by means of distinguishing and limiting past decisions and by advancing various considerations of policy to stimulate a narrowing of the apparent scope of the rule. Whatever considerations are thought to predominate, it is plain that the problems involved are uniquely federal in nature. If federal authority, in this instance this Court, orders the field of judicial competence in this area for the federal courts, and the state courts are left free to formulate their own rules, the purposes behind the doctrine could be as effectively undermined as if there had been no federal pronouncement on the subject.

We could perhaps in this diversity action avoid the question of deciding whether federal or state law is applicable to this aspect of the litigation. New York has enunciated the act of state doctrine in terms that echo those of federal decisions decided during the reign of *Swift* v. *Tyson,* 16 Pet. 1. In *Hatch* v. *Baez,* 7 Hun 596, 599 (N. Y. Sup. Ct.), *Underhill* was foreshadowed by the words, "the courts of one country are bound to abstain from sitting in judgment on the acts of another government done within its own territory." More recently, the Court of Appeals in *Salimoff & Co.* v. *Standard Oil Co.,* 262 N. Y. 220, 224, 186 N. E. 679, 681, has declared, "The courts of one independent government will not sit in judgment upon the validity of the acts of another done

---

[22] See, *e. g.,* Association of the Bar of the City of New York, Committee on International Law, A Reconsideration of the Act of State Doctrine in United States Courts (1959); Domke, *supra,* note 21; Mann, International Delinquencies Before Municipal Courts, 70 L. Q. Rev. 181 (1954); Zander, The Act of State Doctrine, 53 Am. J. Int'l L. 826 (1959). But see, *e. g.,* Falk, Toward a Theory of the Participation of Domestic Courts in the International Legal Order: A Critique of Banco Nacional de Cuba v. Sabbatino, 16 Rutgers L. Rev. 1 (1961); Reeves, Act of State Doctrine and the Rule of Law— A Reply, 54 Am. J. Int'l L. 141 (1960).

within its own territory, even when such government seizes and sells the property of an American citizen within its boundaries." Cf. *Dougherty* v. *Equitable Life Assurance Society*, 266 N. Y. 71, 193 N. E. 897; *Holzer* v. *Deutsche Reichsbahn-Gesellschaft*, 277 N. Y. 474, 14 N. E. 2d 798. But cf. *Frenkel & Co.* v. *L'Urbaine Fire Ins. Co.*, 251 N. Y. 243, 167 N. E. 430. Thus our conclusions might well be the same whether we dealt with this problem as one of state law, see *Erie R. Co.* v. *Tompkins*, 304 U. S. 64; *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U. S. 487; *Griffin* v. *McCoach*, 313 U. S. 498, or federal law.

However, we are constrained to make it clear that an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community must be treated exclusively as an aspect of federal law.[23] It seems fair to assume that the Court did not have rules like the act of state doctrine in mind when it decided *Erie R. Co.* v. *Tompkins*. Soon thereafter, Professor Philip C. Jessup, now a judge of the International Court of Justice, recognized the potential dangers were *Erie* extended to legal problems affecting international relations.[24] He cautioned that rules of international law should not be left to divergent and perhaps parochial state interpretations. His basic rationale is equally applicable to the act of state doctrine.

---

[23] At least this is true when the Court limits the scope of judicial inquiry. We need not now consider whether a state court might, in certain circumstances, adhere to a more restrictive view concerning the scope of examination of foreign acts than that required by this Court.

[24] The Doctrine of Erie Railroad v. Tompkins Applied to International Law, 33 Am. J. Int'l L. 740 (1939).

The Court in the pre-*Erie* act of state cases, although not burdened by the problem of the source of applicable law, used language sufficiently strong and broad-sweeping to suggest that state courts were not left free to develop their own doctrines (as they would have been had this Court merely been interpreting common law under *Swift* v. *Tyson, supra*). The Court of Appeals in the first *Bernstein* case, *supra,* a diversity suit, plainly considered the decisions of this Court, despite the intervention of *Erie,* to be controlling in regard to the act of state question, at the same time indicating that New York law governed other aspects of the case. We are not without other precedent for a determination that federal law governs; there are enclaves of federal judge-made law which bind the States. A national body of federal-court-built law has been held to have been contemplated by § 301 of the Labor Management Relations Act, *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448. Principles formulated by federal judicial law have been thought by this Court to be necessary to protect uniquely federal interests, *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* 315 U. S. 447; *Clearfield Trust Co.* v. *United States,* 318 U. S. 363. Of course the federal interest guarded in all these cases is one the ultimate statement of which is derived from a federal statute. Perhaps more directly in point are the bodies of law applied between States over boundaries and in regard to the apportionment of interstate waters.

In *Hinderlider* v. *La Plata River Co.,* 304 U. S. 92, 110, in an opinion handed down the same day as *Erie* and by the same author, Mr. Justice Brandeis, the Court declared, "For whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the statutes nor the decisions of either State can be conclusive." Although the suit was between two private litigants and

the relevant States could not be made parties, the Court considered itself free to determine the effect of an interstate compact regulating water apportionment. The decision implies that no State can undermine the federal interest in equitably apportioned interstate waters even if it deals with private parties. This would not mean that, absent a compact, the apportionment scheme could not be changed judicially or by Congress, but only that apportionment is a matter of federal law. Cf. *Arizona* v. *California*, 373 U. S. 546, 597–598. The problems surrounding the act of state doctrine are, albeit for different reasons, as intrinsically federal as are those involved in water apportionment or boundary disputes. The considerations supporting exclusion of state authority here are much like those which led the Court in *United States* v. *California*, 332 U. S. 19, to hold that the Federal Government possessed paramount rights in submerged lands though within the three-mile limit of coastal States. We conclude that the scope of the act of state doctrine must be determined according to federal law.[25]

## VI.

If the act of state doctrine is a principle of decision binding on federal and state courts alike but compelled by neither international law nor the Constitution, its continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and

[25] Various constitutional and statutory provisions indirectly support this determination, see U. S. Const., Art. I, § 8, cls. 3, 10; Art. II, §§ 2, 3; Art. III, § 2; 28 U. S. C. §§ 1251 (a) (2), (b) (1), (b) (3), 1332 (a) (2), 1333, 1350–1351, by reflecting a concern for uniformity in this country's dealings with foreign nations and indicating a desire to give matters of international significance to the jurisdiction of federal institutions. See Comment, The Act of State Doctrine— Its Relation to Private and Public International Law, 62 Col. L. Rev., 1278, 1297, n. 123; cf. *United States* v. *Belmont, supra; United States* v. *Pink, supra*.

political branches of the Government on matters bearing upon foreign affairs. It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence, as in the *Bernstein* case, for the political interest of this country may, as a result, be measurably altered. Therefore, rather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

There are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens.[26]

---

[26] Compare, *e. g.*, Friedman, Expropriation in International Law 206–211 (1953); Dawson and Weston, "Prompt, Adequate and Effective": A Universal Standard of Compensation? 30 Fordham L. Rev. 727 (1962), with Note from Secretary of State Hull to Mexican Ambassador, August 22, 1938, V Foreign Relations of the United

There is, of course, authority, in international judicial [27] and arbitral [28] decisions, in the expressions of national governments,[29] and among commentators [30] for the view that a taking is improper under international law if it is not for a public purpose, is discriminatory, or is without provision for prompt, adequate, and effective compensation. However, Communist countries, although they have in fact provided a degree of compensation after diplomatic efforts, commonly recognize no obligation on the part of the taking country.[31] Certain representatives of the newly independent and underdeveloped countries

States 685 (1938); Doman, Postwar Nationalization of Foreign Property in Europe, 48 Col. L. Rev. 1125, 1127 (1948). We do not, of course, mean to say that there is no international standard in this area; we conclude only that the matter is not meet for adjudication by domestic tribunals.

[27] See *Oscar Chinn Case*, P. C. I. J., ser. A/B, No. 63, at 87 (1934); *Chorzow Factory Case*, P. C. I. J., ser. A., No. 17, at 46, 47 (1928).

[28] See, *e. g., Norwegian Shipowners' Case* (Norway/United States) (Perm. Ct. Arb.) (1922), 1 U. N. Rep. Int'l Arb. Awards 307, 334, 339 (1948), Hague Court Reports, 2d Series, 39, 69, 74 (1932); *Marguerite de Joly de Sabla,* American and Panamanian General Claims Arbitration 379, 447, 6 U. N. Rep. Int'l Arb. Awards 358, 366 (1955).

[29] See, *e. g.,* Dispatch from Lord Palmerston to British Envoy at Athens, Aug. 7, 1846, 39 British and Foreign State Papers 1849–1850, 431–432. Note from Secretary of State Hull to Mexican Ambassador, July 21, 1938, V Foreign Relations of the United States 674 (1938); Note to the Cuban Government, July 16, 1960, 43 Dept. State Bull. 171 (1960).

[30] See, *e. g.,* McNair, The Seizure of Property and Enterprises in Indonesia, 6 Netherlands Int'l L. Rev. 218, 243–253 (1959); Restatement, Foreign Relations Law of the United States (Proposed Official Draft 1962), §§ 190–195.

[31] See Doman, *supra,* note 26, at 1143–1158; Fleming, States, Contracts and Progress, 62–63 (1960); Bystricky, Notes on Certain International Legal Problems Relating to Socialist Nationalisation, in International Assn. of Democratic Lawyers, Proceedings of the Commission on Private International Law, Sixth Congress (1956), 15.

have questioned whether rules of state responsibility toward aliens can bind nations that have not consented to them [32] and it is argued that the traditionally articulated standards governing expropriation of property reflect "imperialist" interests and are inappropriate to the circumstances of emergent states.[33]

The disagreement as to relevant international law standards reflects an even more basic divergence between the national interests of capital importing and capital exporting nations and between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system. It is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations.[34]

When we consider the prospect of the courts characterizing foreign expropriations, however justifiably, as invalid under international law and ineffective to pass title, the wisdom of the precedents is confirmed. While each of the leading cases in this Court may be argued to be distinguishable on its facts from this one—*Underhill* because sovereign immunity provided an independent ground and *Oetjen, Ricaud,* and *Shapleigh* because there

---

[32] See Anand, Role of the "New" Asian-African Countries in the Present International Legal Order, 56 Am. J. Int'l L. 383 (1962); Roy, Is the Law of Responsibility of States for Injuries to Aliens a Part of Universal International Law? 55 Am. J. Int'l L. 863 (1961).

[33] See 1957 Yb. U. N. Int'l L. Comm'n (Vol. 1) 155, 158 (statements of Mr. Padilla Nervo (Mexico) and Mr. Pal (India)).

[34] There are, of course, areas of international law in which consensus as to standards is greater and which do not represent a battleground for conflicting ideologies. This decision in no way intimates that the courts of this country are broadly foreclosed from considering questions of international law.

was actually no violation of international law—the plain implication of all these opinions, and the import of express statements in *Oetjen,* 246 U. S., at 304, and *Shapleigh,* 299 U. S., at 471, is that the act of state doctrine is applicable even if international law has been violated. In *Ricaud,* the one case of the three most plausibly involving an international law violation, the possibility of an exception to the act of state doctrine was not discussed. Some commentators have concluded that it was not brought to the Court's attention,[35] but Justice Clarke delivered both the *Oetjen* and *Ricaud* opinions, on the same day, so we can assume that principles stated in the former were applicable to the latter case.

The possible adverse consequences of a conclusion to the contrary of that implicit in these cases is highlighted by contrasting the practices of the political branch with the limitations of the judicial process in matters of this kind. Following an expropriation of any significance, the Executive engages in diplomacy aimed to assure that United States citizens who are harmed are compensated fairly. Representing all claimants of this country, it will often be able, either by bilateral or multilateral talks, by submission to the United Nations, or by the employment of economic and political sanctions, to achieve some degree of general redress. Judicial determinations of invalidity of title can, on the other hand, have only an occasional impact, since they depend on the fortuitous circumstance of the property in question being brought into this country.[36] Such decisions would, if the acts in-

---

[35] See Restatement, Foreign Relations Law of the United States, Reporters' Notes (Proposed Official Draft 1962), § 43, note 3.

[36] It is, of course, true that such determinations might influence others not to bring expropriated property into the country, see pp. 433–434, *infra,* so their indirect impact might extend beyond the actual invalidations of title.

volved were declared invalid, often be likely to give offense to the expropriating country; since the concept of territorial sovereignty is so deep seated, any state may resent the refusal of the courts of another sovereign to accord validity to acts within its territorial borders. Piecemeal dispositions of this sort involving the probability of affront to another state could seriously interfere with negotiations being carried on by the Executive Branch and might prevent or render less favorable the terms of an agreement that could otherwise be reached. Relations with third countries which have engaged in similar expropriations would not be immune from effect.

The dangers of such adjudication are present regardless of whether the State Department has, as it did in this case, asserted that the relevant act violated international law. If the Executive Branch has undertaken negotiations with an expropriating country, but has refrained from claims of violation of the law of nations, a determination to that effect by a court might be regarded as a serious insult, while a finding of compliance with international law would greatly strengthen the bargaining hand of the other state with consequent detriment to American interests.

Even if the State Department has proclaimed the impropriety of the expropriation, the stamp of approval of its view by a judicial tribunal, however impartial, might increase any affront and the judicial decision might occur at a time, almost always well after the taking, when such an impact would be contrary to our national interest. Considerably more serious and far-reaching consequences would flow from a judicial finding that international law standards had been met if that determination flew in the face of a State Department proclamation to the contrary. When articulating principles of international law in its relations with other states, the Executive Branch speaks not only as an interpreter of generally accepted and tradi-

tional rules, as would the courts, but also as an advocate of standards it believes desirable for the community of nations and protective of national concerns. In short, whatever way the matter is cut, the possibility of conflict between the Judicial and Executive Branches could hardly be avoided.

Respondents contend that, even if there is not agreement regarding general standards for determining the validity of expropriations, the alleged combination of retaliation, discrimination, and inadequate compensation makes it patently clear that this particular expropriation was in violation of international law.[37] If this view is accurate, it would still be unwise for the courts so to determine. Such a decision now would require the drawing of more difficult lines in subsequent cases and these would involve the possibility of conflict with the Executive view. Even if the courts avoided this course, either by presuming the validity of an act of state whenever the international law standard was thought unclear or by following the State Department declaration in such a situation, the very expression of judicial uncertainty might provide embarrassment to the Executive Branch.

Another serious consequence of the exception pressed by respondents would be to render uncertain titles in foreign commerce, with the possible consequence of altering the flow of international trade.[38] If the attitude of the

---

[37] Of course, to assist respondents in this suit such a determination would have to include a decision that for the purpose of judging this expropriation under international law C. A. V. is not to be regarded as Cuban and an acceptance of the principle that international law provides other remedies for breaches of international standards of expropriation than suits for damages before international tribunals. See 307 F. 2d, at 861, 868 for discussion of these questions by the Court of Appeals.

[38] This possibility is consistent with the view that the deterrent effect of court invalidations would not ordinarily be great. If the expropriating country could find other buyers for its products at

United States courts were unclear, one buying expropriated goods would not know if he could safely import them into this country. Even were takings known to be invalid, one would have difficulty determining after goods had changed hands several times whether the particular articles in question were the product of an ineffective state act.[39]

Against the force of such considerations, we find respondents' countervailing arguments quite unpersuasive. Their basic contention is that United States courts could make a significant contribution to the growth of international law, a contribution whose importance, it is said, would be magnified by the relative paucity of decisional law by international bodies. But given the fluidity of present world conditions, the effectiveness of such a patchwork approach toward the formulation of an acceptable body of law concerning state responsibility for expropriations is, to say the least, highly conjectural. Moreover, it rests upon the sanguine presupposition that the decisions of the courts of the world's major capital exporting country and principal exponent of the free

---

roughly the same price, the deterrent effect might be minimal although patterns of trade would be significantly changed.

[39] Were respondents' position adopted, the courts might be engaged in the difficult tasks of ascertaining the origin of fungible goods, of considering the effect of improvements made in a third country on expropriated raw materials, and of determining the title to commodities subsequently grown on expropriated land or produced with expropriated machinery.

By discouraging import to this country by traders certain or apprehensive of nonrecognition of ownership, judicial findings of invalidity of title might limit competition among sellers; if the excluded goods constituted a significant portion of the market, prices for United States purchasers might rise with a consequent economic burden on United States consumers. Balancing the undesirability of such a result against the likelihood of furthering other national concerns is plainly a function best left in the hands of the political branches.

enterprise system would be accepted as disinterested expressions of sound legal principle by those adhering to widely different ideologies.

It is contended that regardless of the fortuitous circumstances necessary for United States jurisdiction over a case involving a foreign act of state and the resultant isolated application to any expropriation program taken as a whole, it is the function of the courts to justly decide individual disputes before them. Perhaps the most typical act of state case involves the original owner or his assignee suing one not in association with the expropriating state who has had "title" transferred to him. But it is difficult to regard the claim of the original owner, who otherwise may be recompensed through diplomatic channels, as more demanding of judicial cognizance than the claim of title by the innocent third party purchaser, who, if the property is taken from him, is without any remedy.

Respondents claim that the economic pressure resulting from the proposed exception to the act of state doctrine will materially add to the protection of United States investors. We are not convinced, even assuming the relevance of this contention. Expropriations take place for a variety of reasons, political and ideological as well as economic. When one considers the variety of means possessed by this country to make secure foreign investment, the persuasive or coercive effect of judicial invalidation of acts of expropriation dwindles in comparison. The newly independent states are in need of continuing foreign investment; the creation of a climate unfavorable to such investment by wholesale confiscations may well work to their long-run economic disadvantage. Foreign aid given to many of these countries provides a powerful lever in the hands of the political branches to ensure fair treatment of United States nationals. Ultimately the sanctions of economic embargo and the freezing of assets in this country may be

employed. Any country willing to brave any or all of these consequences is unlikely to be deterred by sporadic judicial decisions directly affecting only property brought to our shores. If the political branches are unwilling to exercise their ample powers to effect compensation, this reflects a judgment of the national interest which the judiciary would be ill-advised to undermine indirectly.

It is suggested that if the act of state doctrine is applicable to violations of international law, it should only be so when the Executive Branch expressly stipulates that it does not wish the courts to pass on the question of validity. See Association of the Bar of the City of New York, Committee on International Law, A Reconsideration of the Act of State Doctrine in United States Courts (1959). We should be slow to reject the representations of the Government that such a reversal of the *Bernstein* principle would work serious inroads on the maximum effectiveness of United States diplomacy. Often the State Department will wish to refrain from taking an official position, particularly at a moment that would be dictated by the development of private litigation but might be inopportune diplomatically. Adverse domestic consequences might flow from an official stand which could be assuaged, if at all, only by revealing matters best kept secret. Of course, a relevant consideration for the State Department would be the position contemplated in the court to hear the case. It is highly questionable whether the examination of validity by the judiciary should depend on an educated guess by the Executive as to probable result and, at any rate, should a prediction be wrong, the Executive might be embarrassed in its dealings with other countries. We do not now pass on the *Bernstein* exception, but even if it were deemed valid, its suggested extension is unwarranted.

However offensive to the public policy of this country and its constituent States an expropriation of this kind

may be, we conclude that both the national interest and progress toward the goal of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in this realm of its application.

## VII.

Finally, we must determine whether Cuba's status as a plaintiff in this case dictates a result at variance with the conclusions reached above. If the Court were to distinguish between suits brought by sovereign states and those of assignees, the rule would have little effect unless a careful examination were made in each case to determine if the private party suing had taken property in good faith. Such an inquiry would be exceptionally difficult, since the relevant transaction would almost invariably have occurred outside our borders. If such an investigation were deemed irrelevant, a state could always assign its claim.

It is true that the problem of security of title is not directly presented in the instance of a sovereign plaintiff, although were such a plaintiff denied relief, it would ship its goods elsewhere, thereby creating an alteration in the flow of trade. The sensitivity in regard to foreign relations and the possibility of embarrassment of the Executive are, of course, heightened by the presence of a sovereign plaintiff. The rebuke to a recognized power would be more pointed were it a suitor in our courts. In discussing the rule against enforcement of foreign penal and revenue laws, the Eire High Court of Justice, in *Peter Buchanan Ltd.* v. *McVey,* [1955] A. C. 516, 529–530, aff'd, *id.,* at 530, emphasized that its justification was in large degree the desire to avoid embarrassing another state by scrutinizing its penal and revenue laws. Although that rule presumes invalidity in the forum whereas the act of state principle presumes the contrary, the doctrines have a common rationale, a rationale that negates

the wisdom of discarding the act of state rule when the plaintiff is a state which is not seeking enforcement of a public act.

Certainly the distinction proposed would sanction self-help remedies, something hardly conducive to a peaceful international order. Had Farr, Whitlock not converted the bills of lading, or alternatively breached its contract, Cuba could have relied on the act of state doctrine in defense of a claim brought by C. A. V. for the proceeds. It would be anomalous to preclude reliance on the act of state doctrine because of Farr, Whitlock's unilateral action, however justified such action may have been under the circumstances.

Respondents offer another theory for treating the case differently because of Cuba's participation. It is claimed that the forum should simply apply its own law to all the relevant transactions. An analogy is drawn to the area of sovereign immunity, *National City Bank* v. *Republic of China,* 348 U. S. 356, in which, if a foreign country seeks redress in our courts, counterclaims are permissible. But immunity relates to the prerogative right not to have sovereign property subject to suit; fairness has been thought to require that when the sovereign seeks recovery, it be subject to legitimate counterclaims against it. The act of state doctrine, however, although it shares with the immunity doctrine a respect for sovereign states, concerns the limits for determining the validity of an otherwise applicable rule of law. It is plain that if a recognized government sued on a contract with a United States citizen, concededly legitimate by the locus of its making, performance, and most significant contacts, the forum would not apply its own substantive law of contracts. Since the act of state doctrine reflects the desirability of presuming the relevant transaction valid, the same result follows; the forum may not apply its local law regarding foreign expropriations.

Since the act of state doctrine proscribes a challenge to the validity of the Cuban expropriation decree in this case, any counterclaim based on asserted invalidity must fail. Whether a theory of conversion or breach of contract is the proper cause of action under New York law, the presumed validity of the expropriation is unaffected. Although we discern no remaining litigable issues of fact in this case, the District Court may hear and decide them if they develop.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court for proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, dissenting.

I am dismayed that the Court has, with one broad stroke, declared the ascertainment and application of international law beyond the competence of the courts of the United States in a large and important category of cases. I am also disappointed in the Court's declaration that the acts of a sovereign state with regard to the property of aliens within its borders are beyond the reach of international law in the courts of this country. However clearly established that law may be, a sovereign may violate it with impunity, except insofar as the political branches of the government may provide a remedy. This backward-looking doctrine, never before declared in this Court, is carried a disconcerting step further: not only are the courts powerless to question acts of state proscribed by international law but they are likewise powerless to refuse to adjudicate the claim founded upon a foreign law; they must render judgment and thereby validate the lawless act. Since the Court expressly extends its ruling to all acts of state expropriating property, however clearly inconsistent with the international com-

440

munity, all discriminatory expropriations of the property of aliens, as for example the taking of properties of persons belonging to certain races, religions or nationalities, are entitled to automatic validation in the courts of the United States. No other civilized country has found such a rigid rule necessary for the survival of the executive branch of its government; the executive of no other government seems to require such insulation from international law adjudications in its courts; and no other judiciary is apparently so incompetent to ascertain and apply international law.[1]

[1] The courts of the following countries, among others, and their territories have examined a fully "executed" foreign act of state expropriating property:

England: *Anglo-Iranian Oil Co.* v. *Jaffrate*, [1953] Int'l L. Rep. 316 (Aden Sup. Ct.); *N. V. de Bataafsche Petroleum Maatschappij* v. *The War Damage Comm'n*, [1956] Int'l L. Rep. 810 (Singapore Ct. App.).

Netherlands: *Senembah Maatschappij N. V.* v. *Rupubliek Indonesie Bank Indonesia*, Nederlandse Jurisprudentie 1959, No. 73, p. 218 (Amsterdam Ct. App.), excerpts reprinted in Domke, Indonesian Nationalization Measures Before Foreign Courts, 54 Am. J. Int'l L. 305, 307–315 (1960).

Germany: *N. V. Verenigde Deli-Maatschapijen* v. *Deutsch-Indonesische Tabak-Handelsgesellschaft m. b. H.* (Bremen Ct. App.), excerpts reprinted in Domke, *supra*, at 313–314 (1960); Confiscation of Property of Sudeten Germans Case, [1948] Ann. Dig. 24, 25 (No. 12) (Amtsgericht of Dingolfing).

Japan: *Anglo-Iranian Oil Co.* v. *Idemitsu Kosan Kabushiki Kaisha*. [1953] Int'l L. Rep. 305 (Dist. Ct. of Tokyo), aff'd, [1953] Int'l L. Rep. 312 (High Ct. of Tokyo).

Italy: *Anglo-Iranian Oil Co.* v. *S. U. P. O. R. Co.*, [1955] Int'l L. Rep. 19 (Ct. of Venice); *Anglo-Iranian Oil Co.* v. *S. U. P. O. R. Co.*, [1955] Int'l L. Rep. 23 (Civ. Ct. of Rome).

France: *Volatron* v. *Moulin*, [1938–1940] Ann. Dig. 24 (Ct. of App. of Aix); *Société Potasas Ibericas* v. *Nathan Bloch*, [1938–1940] Ann. Dig. 150 (Ct. of Cassation).

The Court does not refer to any country which has applied the act of state doctrine in a case where a substantial international law

I do not believe that the act of state doctrine, as judicially fashioned in this Court, and the reasons underlying it, require American courts to decide cases in disregard of international law and of the rights of litigants to a full determination on the merits.

## I.

Prior decisions of this Court in which the act of state doctrine was deemed controlling do not support the assertion that foreign acts of state must be enforced or recognized or applied in American courts when they violate the law of nations. These cases do hold that a foreign act of state applied to persons or property within its borders may not be denied effect in our courts on the ground that it violates the public policy of the forum. Also the broad language in some of these cases does evince

---

issue is sought to be raised by an alien whose property has been expropriated. This country and this Court stand alone among the civilized nations of the world in ruling that such an issue is not cognizable in a court of law.

The Court notes that the courts of both New York and Great Britain have articulated the act of state doctrine in broad language similar to that used by this Court in *Underhill* v. *Hernandez,* 168 U. S. 250, and from this it infers that these courts recognize no international law exception to the act of state doctrine. The cases relied on by the Court involved no international law issue. For in these cases the party objecting to the validity of the foreign act was a citizen of the foreign state. It is significant that courts of both New York and Great Britain, in apparently the first cases in which an international law issue was squarely posed, ruled that the act of state doctrine was no bar to examination of the validity of the foreign act. *Anglo-Iranian Oil Co.* v. *Jaffrate,* [1953] Int'l L. Rep. 316 (Aden Sup. Ct.): "[T]he Iranian Laws of 1951 were invalid by international law, for, by them, the property of the company was expropriated without any compensation." *Sulyok* v. *Penzintezeti Kozpont Budapest,* 279 App. Div. 528, 111 N. Y. S. 2d 75, aff'd, 304 N. Y. 704, 107 N. E. 2d 604 (foreign expropriation of intangible property denied effect as contrary to New York public policy).

an attitude of caution and self-imposed restraint in dealing with the laws of a foreign nation. But violations of international law were either not presented in these cases, because the parties or predecessors in title were nationals of the acting state, or the claimed violation was insubstantial in light of the facts presented to the Court and the principles of international law applicable at the time.[2]

---

[2] In one of the earliest decisions of this Court even arguably invoking the act of state doctrine, *Hudson* v. *Guestier,* 4 Cranch 293, Chief Justice Marshall held that the validity of a seizure by a foreign power of a vessel within the jurisdiction of the sentencing court could not be reviewed "unless the court passing the sentence loses its jurisdiction by some circumstance *which the law of nations can notice."* (Emphasis added.) *Underhill* v. *Hernandez,* 168 U. S. 250, where the Court stated the act of state doctrine in its oft-quoted form, was a suit in tort by an American citizen against an officer of the Venezuelan Government for an unlawful detention and compelled operation of the plaintiff's water facilities during the course of a revolution in that country. Well-established principles of immunity precluded the plaintiff's suit, and this was one of the grounds for dismissal. However, as noted above, the Court did invoke the act of state doctrine in dismissing the suit and arguably the forced detention of a foreign citizen posed a claim cognizable under international law. But the Court did not ignore this possibility of a violation of international law; rather in distinguishing cases involving arrests by military authorities in the absence of war and those concerning the right of revolutionary bodies to interfere with commerce, the Court passed on the merits of plaintiff's claim under international law and deemed the claim without merit under then existing doctrines. "[A]cts of *legitimate* warfare cannot be made the basis of individual liability." (Emphasis added.) 168 U. S., at 253. Indeed the Court cited *Dow* v. *Johnson,* 100 U. S. 158, a suit arising from seizures by American officers in the South during the Civil War, in which it was held without any reliance on the act of state doctrine that the law of nations precluded making acts of legitimate warfare a basis for liability after the cessation of hostilities, and *Ford* v. *Surget,* 97 U. S. 594, which held an officer of the Confederacy immune from damages for the destruction of property during the war. *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, a case often invoked for the blanket prohibition of

These cases do not strongly imply or even suggest that the Court would woodenly apply the act of state doctrine and grant enforcement to a foreign act where the act was a clear and flagrant violation of international law,

the act of state doctrine, held only that the antitrust laws did not extend to acts committed by a private individual in a foreign country with the assistance of a foreign government. Most of the language in that case is in response to the issue of how far legislative jurisdiction should be presumed to extend in the absence of an express declaration. The Court held that the ordinary understandings of sovereignty warranted the proposition that conduct of an American citizen should ordinarily be adjudged under the law where the acts occurred. Rather than ignoring international law, the law of nations was relied on for this rule of statutory construction.

More directly in point are the Mexican seizures passed upon in *Oetjen* v. *Central Leather Co.*, 246 U. S. 297, and *Ricaud* v. *American Metal Co.*, 246 U. S. 304. In *Oetjen* the plaintiff claimed title from a Mexican owner who was divested of his property during the Mexican revolution. The terms of the expropriation are not clear, but it appears that a promise of compensation was made by the revolutionary government and that the property was to be used for the war effort. The only international law issue arguably present in the case was by virtue of a treaty of the Hague Convention, to which both Mexico and the United States were signatories, governing customs of war on land; although the Court did not rest the decision on the treaty, it took care to point out that this seizure was probably lawful under the treaty as a compelled contribution in time of war for the needs of the occupying army. Moreover, the Court stressed the fact that the title challenged was derived from a Mexican law governing the relations between the Mexican Government and Mexican citizens. Aside from the citizenship of the plaintiff's predecessor in title, the property seized was to satisfy an assessment of the revolutionary government which the Mexican owner had failed to pay. It is doubtful that this measure, even as applied to non-Mexicans, would constitute a violation of international law. *Dow* v. *Johnson, supra.* In *Ricaud* the titleholder was an American and the Court deemed this difference irrelevant "for the reasons given" in *Oetjen*. In *Ricaud* there was a promise to pay for the property seized during the revolution upon the cessation of

as the District Court and the Court of Appeals have found in respect to the Cuban law challenged herein. 193 F. Supp. 375, aff'd, 307 F. 2d 845.

## II.

Though not a principle of international law, the doctrine of restraint, as formulated by this Court, has its roots in sound policy reasons, and it is to these we must turn to decide whether the act of state doctrine should

hostilities and the seizure was to meet exigencies created by the revolution, which was permissible under the provisions of the Hague Convention considered in *Oetjen*. This declaration of legality in the Hague Convention, and the international rules of war on seizures, rendered the allegation of an international law violation in *Ricaud* sufficiently frivolous so that consideration on the merits was unnecessary. The sole question presented in *Shapleigh* v. *Mier*, 299 U. S. 468, concerned the legality of certain action under Mexican law, and the parties expressly declined to press the question of legality under international law. And the Court's language in that case—"For wrongs of that order the remedy to be followed is along the channels of diplomacy"—must be read against the background of an arbitral claims commission that had been set up to determine compensation for claimants in the position of Shapleigh, the existence of which the Court was well aware. "[A] tribunal is in existence, the International Claims Commission, established by convention between the United States and Mexico, to which the plaintiffs are at liberty to submit and have long ago submitted a claim for reparation." 299 U. S., at 471.

In the other cases cited in the Court's opinion, *ante*, pp. 416–417, the act of state doctrine was not even peripherally involved; the law applicable in both *United States* v. *Belmont*, 301 U. S. 324, and *United States* v. *Pink*, 315 U. S. 203, was a compact between the United States and Russia regarding the effect of Russian nationalization decrees on property located in the United States. No one seriously argued that the act of state doctrine precludes reliance on a binational compact dealing with the effect to be afforded or denied a foreign act of state.

be extended to cover wrongs cognizable under international law.

Whatever may be said to constitute an act of state,[3] our decisions make clear that the doctrine of nonreview ordinarily applies to foreign laws affecting tangible property located within the territory of a government which is recognized by the United States. *Oetjen* v. *Central Leather Co.,* 246 U. S. 297; *Ricaud* v. *American Metal Co.,* 246 U. S. 304. This judicially fashioned doctrine of nonreview is a corollary of the principle that ordinarily a state has jurisdiction to prescribe the rules governing the title to property within its territorial sovereignty, see *Clarke* v. *Clarke,* 178 U. S. 186; *De Vaughn* v. *Hutchinson,* 165 U. S. 566, a principle reflected in the conflict of laws rule, adopted in virtually all nations, that the *lex loci* is the law governing title to property.[4] This conflict rule would have been enough in itself to have controlled the outcome of most of the act of state cases decided by this Court. Both of these rules rest on the deeply imbedded postulate in international law of the territorial supremacy of the sovereign, a postulate that has

---

[3] An act of state has been said to be any governmental act in which the sovereign's interest qua sovereign is involved. "The expression 'act of State' usually denotes 'an executive or administrative exercise of sovereign power by an independent State or potentate, or by its or his duly authorized agents or officers.' The expression, however, is not a term of art, and it obviously may, and is in fact often intended to, include legislative and judicial acts such as a statute, decree or order, or a judgment of a superior Court." Mann, The Sacrosanctity of the Foreign Act of State, 59 L. Q. Rev. 42 (1943).

[4] IV Rabel, The Conflict of Laws: A Comparative Study, 30–69 (1958); Ehrenzweig, Conflict of Laws, 607–633 (1962); Rest. (2d ed.) Conflict of Laws, § 254a (Tent. Draft No. 5 (1959)); Baade, Indonesian Nationalization Measures Before Foreign Courts—A Reply, 54 Am. J. Int'l L. 801 (1960); Re, Foreign Confiscations in Anglo-American Law—A Study of the "Rule of Decision" Principle, 49–50 (1951).

been characterized as the touchstone of private and public international law.[5] That the act of state doctrine is rooted in a well-established concept of international law is evidenced by the practice of other countries. These countries, without employing any act of state doctrine, afford substantial respect to acts of foreign states occurring within their territorial confines.[6] Our act of state doctrine, as formulated in past decisions of the Court, carries the territorial concept one step further. It precludes a challenge to the validity of foreign law on the ordinary conflict of laws ground of repugnancy to the public policy of the forum. Against the objection that the foreign act violates domestic public policy, it has been said that the foreign law provides the rule of decision, where the *lex loci* rule would so indicate, in American courts. *Bernstein* v. *Van Heyghen Freres Societe Anonyme,* 163 F. 2d 246, 249 (C. A. 2d Cir.); *Holzer* v. *Deutsche Reichsbahn-Gesellschaft,* 277 N. Y. 474, 14 N. E. 2d 798; *McCarthy* v. *Reichsbank,* 259 App. Div. 1016, 20 N. Y. S. 2d 450, aff'd, 284 N. Y. 739, 31 N. E. 2d 508. But cf. *Sulyok* v. *Penzintezeti Kozpont Budapest,* 279 App.

---

[5] See generally, Kaplan and Katzenbach, The Political Foundations of International Law, 135–172 (1961); Herz, International Politics in the Atomic Age, 58–62 (1959).

[6] *Anglo-Iranian Oil Co.* v. *Idemitsu Kosan Kabushiki Kaisha,* [1953] Int'l L. Rep. 305 (Dist. Ct. of Tokyo), aff'd, [1953] Int'l L. Rep. 312 (High Ct. of Tokyo); *Anglo-Iranian Oil Co.* v. *S. U. P. O. R. Co.,* [1955] Int'l L. Rep. 19 (Ct. of Venice (1953)); *Anglo-Iranian Oil Co.* v. *S. U. P. O. R. Co.,* [1955] Int'l L. Rep. 23, 39–43 (Civ. Ct. of Rome); compare *N. V. Verenigde Deli-Maatschapijen* v. *Deutsch-Indonesische Tabak-Handelsgesellschaft* m. b. H. (Bremen Ct. App.), excerpts reprinted in Domke, Indonesian Nationalization Measures Before Foreign Courts, 54 Am. J. Int'l L. 305, 313–314 (1960), with Confiscation of Property of Sudeten Germans Case, [1948] Ann. Dig. 24, 25 (No. 12) (Amtsgericht of Dingolfing) (discriminatory confiscatory decrees). See also *West Rand Central Gold Mining Co.* v. *The King,* [1905] 2 K. B. 391.

Div. 528, 111 N. Y. S. 2d 75, aff'd, 304 N. Y. 704, 107 N. E. 2d 604. See also *Perutz* v. *Bohemian Discount Bank,* 304 N. Y. 533, 537, 110 N. E. 2d 6, 7.

The reasons that underlie the deference afforded to foreign acts affecting property in the acting country are several; such deference reflects an effort to maintain a certain stability and predictability in transnational transactions, to avoid friction between nations, to encourage settlement of these disputes through diplomatic means- and to avoid interference with the executive control of foreign relations. To adduce sound reasons for a policy of nonreview is not to resolve the problem at hand, but to delineate some of the considerations that are pertinent to its resolution.

Contrary to the assumption underlying the Court's opinion, these considerations are relative, their strength varies from case to case, and they are by no means controlling in all litigation involving the public acts of a foreign government. This is made abundantly clear by numerous cases in which the validity of a foreign act of state is drawn in question and in which these identical considerations are present in the same or a greater degree. American courts have denied recognition or effect to foreign law, otherwise applicable under the conflict of laws rules of the forum, to many foreign laws where these laws are deeply inconsistent with the policy of the forum, notwithstanding that these laws were of obvious political and social importance to the acting country. For example, foreign confiscatory decrees purporting to divest nationals and corporations of the foreign sovereign of property located in the United States uniformly have been denied effect in our courts, including this Court; [7]

---

[7] *Moscow Fire Ins. Co.* v. *Bank of New York,* 280 N. Y. 286, 20 N. E. 2d 758 (1939), aff'd *sub nom. United States* v. *Moscow Fire Ins. Co.,* 309 U. S. 624; *Vladikavkazsky R. Co.* v. *New York Trust*

courts continued to recognize private property rights of Russian corporations owning property within the United States long after the Russian Government, recognized by the United States, confiscated all such property and had rescinded the laws on which corporate identity depended.[8] Furthermore, our courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign.[9] And the judgments of

*Co.,* 263 N. Y. 369, 189 N. E. 456; *Plesch* v. *Banque Nationale de la Republique D'Haiti,* 273 App. Div. 224, 77 N. Y. S. 2d 43, aff'd, 298 N. Y. 573, 81 N. E. 2d 106; *Bollack* v. *Societe Generale,* 263 App. Div. 601, 33 N. Y. S. 2d 986; *Latvian State Cargo & Passenger S. S. Line* v. *McGrath,* 88 U. S. App. D. C. 226, 188 F. 2d 1000.

[8] *Second Russian Ins. Co.* v. *Miller,* 297 F. 404 (C. A. 2d Cir.); *James & Co.* v. *Second Russian Ins. Co.,* 239 N. Y. 248, 146 N. E. 369; *Sokoloff* v. *National City Bank,* 239 N. Y. 158, 145 N. E. 917; *A/S Merilaid & Co.* v. *Chase Nat'l Bank,* 189 Misc. 285, 71 N. Y. S. 2d 377 (Sup. Ct. N. Y.). See also *Compania Ron Bacardi* v. *Bank of Nova Scotia,* 193 F. Supp. 814 (D. C. S. D. N. Y.) (normal conflict of laws rule superseded by a national policy against recognition of Cuban confiscatory decrees).

Similarly, it has been held that nationalization of shares of a foreign corporation or partnership owning property in the United States will not affect the title of former shareholders or partners; the prior owners are deemed to retain their equitable rights in assets located in the United States. *Vladikavkazsky R. Co.* v. *New York Trust Co.,* 263 N. Y. 369, 189 N. E. 456. The acts of a belligerent occupant of a friendly nation in respect to contracts made within the occupied nation have been denied application in our courts. *Aboitiz & Co.* v. *Price,* 99 F. Supp. 602 (D. C. Utah). Compare *Werfel* v. *Zivnostenska Banka,* 260 App. Div. 747, 752, 23 N. Y. S. 2d 1001, 1005.

[9] See the recent affirmation of this doctrine in *Banco do Brasil, S. A.,* v. *Israel. Commodity Co.,* holding that an action by Brazil against a New York coffee importer for fraudulently circumventing Brazilian foreign exchange regulations by forging documents in New York was contrary to New York public policy, notwithstanding that the Bretton Woods agreement, to which both the United States and

foreign courts are denied conclusive or prima facie effect where the judgment is based on a statute unenforceable in the forum, where the procedures of the rendering court markedly depart from our notions of fair procedure, and generally where enforcement would be contrary to the public policy of the forum.[10]  These rules demonstrate that our courts have never been bound to pay unlimited deference to foreign acts of state, defined as an act or law in which the sovereign's governmental interest is involved; they simultaneously cast doubt on the proposition that the additional element in the case at bar, that the property may have been within the territorial confines of Cuba when the expropriation decree was promul-

---

Brazil are parties, expresses a policy favorable to such exchange laws. 12 N. Y. 2d 371, 190 N. E. 2d 235, cert. denied, 376 U. S. 906.  See also *The Antelope,* 10 Wheat. 66, 123; *Huntington* v. *Attrill,* 146 U. S. 657; *Moore* v. *Mitchell,* 30 F. 2d 600, aff'd on other grounds, 281 U. S. 18; Dicey, Conflict of Laws (Morris ed., 7th ed. 1958), 667; Wolff, Private International Law (2d ed. 1950), 525.

[10] *Hilton* v. *Guyot,* 159 U. S. 113 (lack of reciprocity in the foreign state renders the judgment only prima facie evidence of the justice of the plaintiff's claim); cf. *Venezuelan Meat Export Co.* v. *United States,* 12 F. Supp. 379 (D. C. D. Md.); *The W. Talbot Dodge,* 15 F. 2d 459 (D. C. S. D. N. Y.) (fraud is a defense to the enforcement of foreign judgments); *Title Ins. & Trust Co.* v. *California Development Co.,* 171 Cal. 173, 152 P. 542 (fraud); *Banco Minero* v. *Ross,* 106 Tex. 522, 172 S. W. 711 (procedure of Mexican court offensive to natural justice); *De Brimont* v. *Penniman,* 7 Fed. Cas. 309, No. 3,715 (C. C. S. D. N. Y.) (judgment founded on a cause of action contrary to the "policy of our law, and does violence to what we deem the rights of our own citizen"); other cases indicate that American courts will refuse enforcement where protection of American citizens or institutions requires re-examination. *Williams* v. *Armroyd,* 7 Cranch 423; *MacDonald* v. *Grand Trunk R. Co.,* 71 N. H. 448, 52 A. 982; *Caruso* v. *Caruso,* 106 N. J. Eq. 130, 148 A. 882; *Hohner* v. *Gratz,* 50 F. 369 (C. C. S. D. N. Y.) (alternative holding).  See generally Reese, The Status In This Country of Judgments Rendered Abroad, 50 Col. L. Rev. 783 (1950).

gated, requires automatic deference to the decree, regardless of whether the foreign act violates international law.[11]

## III.

I start with what I thought to be unassailable propositions: that our courts are obliged to determine contro-

---

[11] The Court attempts to distinguish between these foreign acts on the ground that all foreign penal and revenue and perhaps other public laws are irrebuttably presumed invalid to avoid the embarrassment stemming from examination of some acts and that all foreign expropriations are presumed valid for the same reason. This distinction fails to explain why it may be more embarrassing to refuse recognition to an extraterritorial confiscatory law directed at nationals of the confiscating state than it would be to refuse effect to a territorial confiscatory law. From the viewpoint of the confiscating state, the need to affect property beyond its borders may be as significant as the need to take title to property within its borders. And it would appear more offensive to notions of sovereignty for an American court to deny enforcement of a foreign law because it is deemed contrary to justice, morals, or public policy, than to deny enforcement because of principles of international law. It will not do to say that the foreign state has no jurisdiction to affect title to property beyond its borders, since other jurisdictional bases, such as citizenship, are invariably present. But for the policy of the forum state, doubtless the foreign law would be given effect under ordinary conflict of laws principles. Compare *Sokoloff* v. *National City Bank,* 239 N. Y. 158, 145 N. E. 917; *Second Russian Ins. Co.* v. *Miller,* 297 F. 404 (C. A. 2d Cir.) with *Werfel* v. *Zivnostenska Banka,* 260 App. Div. 747, 23 N. Y. S. 2d 1001.

The refusal to enforce foreign penal and tax laws and foreign judgments is wholly at odds with the presumption of validity and requirement of enforcement under the act of state doctrine; the political realms of the acting country are clearly involved, the enacting country has a large stake in the decision, and when enforcement is against nationals of the enacting country, jurisdictional bases are clearly present. Moreover, it is difficult, conceptually or otherwise, to distinguish between the situation where a tax judgment secured in a foreign country against one who is in the country at the time of judgment is presented to an American court and the situation where a confiscatory decree is sought to be enforced in American courts.

versies on their merits, in accordance with the applicable law; and that part of the law American courts are bound to administer is international law.

Article III, § 2, of the Constitution states that "[t]he judicial Power shall extend to all Cases . . . affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." And § 1332 of the Judicial Code gives the courts jurisdiction over all civil actions between citizens of a State and foreign states or citizens or subjects thereof. The doctrine that the law of nations is a part of the law of the land, originally formulated in England and brought to America as part of our legal heritage, is reflected in the debates during the Constitutional Convention [12] and in the Constitution itself.[13] This Court has time and again

---

[12] For the extent to which the Framers contemplated the application of international law in American courts and their concern that this body of law be administered uniformly in the federal courts, see The Federalist: No. 3, at 22, by John Jay (Bourne ed. 1947, Book I); No. 80, at 112 and 114; No. 83, at 144, and No. 82, by Alexander Hamilton (Bourne ed. 1947, Book II); No. 42, by James Madison (Bourne ed. 1947, Book I).

Thomas Jefferson, speaking as Secretary of State, wrote to M. Genet, French Minister, in 1793: "The law of nations makes an integral part . . . of the laws of the land." I Moore, Digest of International Law (1906), 10. And see the opinion of Attorney General Randolph given in 1792: "The law of nations, although not specially adopted by the constitution or any municipal act, is essentially a part of the law of the land." 1 Op. Atty. Gen. 27. Also see Warren, The Making of the Constitution, Pt. II, c. I, at 116; Madison's Notes in 1 Farrand 21, 22, 244, 316. See generally Dickinson, The Law of Nations as Part of the National Law of the United States, 101 U. of Pa. L. Rev. 26 (1952).

[13] This intention was reflected and implemented in the Articles of the Constitution. Article I, § 8, empowers the Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and

effectuated the clear understanding of the Framers, as embodied in the Constitution, by applying the law of nations to resolve cases and controversies.[14]   As stated in *The Paquete Habana,* 175 U. S. 677, 700, "[i]nternational law

Offences against the Law of Nations."   Article III, § 2, extends the judicial power "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

[14] As early as 1793, Chief Justice Jay stated in *Chisholm* v. *Georgia* that "Prior . . . to that period [the date of the Constitution], the United States had, by taking a place among the nations of the earth, become amenable to the law of nations."   2 Dall. 419, at 474.   And in 1796, Justice Wilson stated in *Ware* v. *Hylton:* "When the United States declared their independence, they were bound to receive the law of nations, in its modern state of purity and refinement."   3 Dall. 199, at 281.   Chief Justice Marshall was even more explicit in *The Nereide,* when he said:

"If it be the will of the government to apply to Spain any rule respecting captures which Spain is supposed to apply to us, the government will manifest that will by passing an act for the purpose. .Till such an act be passed, the Court is bound by the law of nations which is a part of the law of the land."   9 Cranch 388, at 423.

As to the effect such an Act of Congress would have on international law, the Court has ruled that an Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.   *MacLeod* v. *United States,* 229 U. S. 416, 434 (1913).

As was well stated in *Hilton* v. *Guyot:*

"International law, in its widest and most comprehensive sense—including not only questions of right between nations, governed by what has been appropriately called the law of nations; but also questions arising under what is usually called private international law, or the conflict of laws, and concerning the rights of persons within

is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination." Principles of international law have been applied in our courts to resolve controversies not merely because they provide a convenient rule for decision but because they represent a consensus among civilized nations on the proper ordering of relations between nations and the citizens thereof. Fundamental fairness to litigants as well as the interest in stability of relationships and preservation of reasonable expectations call for their application whenever international law is controlling in a case or controversy.[15]

the territory and dominion of one nation, by reason of acts, private or public, done within the dominions of another nation—is part of our law, and must be ascertained and administered by the courts of justice, as often as such questions are presented in litigation between man and man, duly submitted to their determination.

"The most certain guide, no doubt, for the decision of such questions is a treaty or a statute of this country. But when, as is the case here, there is no written law upon the subject, the duty still rests upon the judicial tribunals of ascertaining and declaring what the law is, whenever it becomes necessary to do so, in order to determine the rights of parties to suits regularly brought before them. In doing this, the courts must obtain such aid as they can from judicial decisions, from the works of jurists and commentators, and from the acts and usages of civilized nations." 159 U. S. 113, 163 (1895).

For other cases which explicitly invoke the principle that international law is a part of the law of the land, see, for example: *Talbot* v. *Janson*, 3 Dall. 133, 161; *Respublica* v. *De Longchamps*, 1 Dall. 111, 116; *The Rapid*, 8 Cranch 155, 162; *Fremont* v. *United States*, 17 How. 542, 557; *United States* v. *Arjona*, 120 U. S. 479.

[15] Among others, international law has been relied upon in cases concerning the acquisition and control of territory, *Jones* v. *United States*, 137 U. S. 202; *Mormon Church* v. *United States*, 136 U. S. 1; *Dorr* v. *United States*, 195 U. S. 138; the resolution of boundary disputes, *Iowa* v. *Illinois*, 147 U. S. 1; *Arkansas* v. *Tennessee*, 246 U. S. 158; questions of nationality, *United States* v. *Wong Kim Ark*, 169 U. S. 649; *Inglis* v. *The Trustees of the Sailor's Snug Harbour*, 3 Pet.

454

The relevance of international law to a just resolution of this case is apparent from the impact of international law on other aspects of this controversy. Indeed it is only because of the application of international rules to resolve other issues that the act of state doctrine becomes the determinative issue in this case. The basic rule that the law of the situs of property is the proper law to be applied in determining title in other forums, whether styled a rule of private international law or domestic conflict of law, is rooted in concepts firmly embedded in a consensus of nations on territorial sovereignty. Without such a consensus and the conflict of laws rule derived therefrom, the question of whether Cuba's decree can be measured against the norms of international law would never arise in this litigation, since then a court presumably would be free to apply its own rules governing the acquisition of title to property. Furthermore, the contention that the sugar in question was within the territorial confines of Cuba when the Cuban decree was enacted itself rests on widely accepted principles of international law, namely, that the bays or inlets contiguous to a country are within its boundaries and that territorial jurisdiction extends at least three miles beyond these boundaries. See Oppenheim, International Law, §§ 186, 190–191 (Lauterpacht, 8th ed. 1955). Without these rules derived from international law, this confiscation could be characterized as extraterritorial and therefore— unless the Court also intends to change this rule—subject to the public policy test traditionally applied to extraterritorial takings of property, even though embarrassing to foreign affairs. Further, in response to the contention

---

99; principles of war and neutrality and their effect on private rights, *The Steamship Appam*, 243 U. S. 124; *Dow* v. *Johnson*, 100 U. S. 158; *Ford* v. *Surget*, 97 U. S. 594; and private property rights generally, *The Schooner Exchange* v. *McFaddon*, 7 Cranch 116; *United States* v. *Percheman*, 7 Pet. 51.

that title to the sugar had already passed to Farr, Whitlock by virtue of the contract with C. A. V. when the nationalization decree took effect, it was held below that under *"the law merchant common to civilized countries"* (emphasis supplied) Farr, Whitlock could not acquire title to the shipment until payment was made in New York. Thus the central issue in this litigation is posed only because of numerous other applications of the law of nations and domestic rules derived therefrom in respect to subsidiary, but otherwise controlling, legal issues in the controversy.

The Court accepts the application of rules of international law to other aspects of this litigation, accepts the relevance of international law in other cases and announces that when there is an appropriate degree of "consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice." *Ante,* p. 428. The Court then, rather lightly in my view, dispenses with its obligation to resolve controversies in accordance with "international justice" and the "national interest" by assuming and declaring that there are no areas of agreement between nations in respect to expropriations. There may not be. But without critical examination, which the Court fails to provide, I would not conclude that a confiscatory taking which discriminates against nationals of another country to retaliate against the government of that country falls within that area of issues in international law "on which opinion seems to be so divided." Nor would I assume, as the ironclad rule of the Court necessarily implies, that there is not likely to be a consensus among nations in this area, as for example upon the illegality of discriminatory takings of alien property based upon race,

religion or nationality.[16]  But most of all I would not declare that even if there were a clear consensus in the international community, the courts must close their eyes to a lawless act and validate the transgression by rendering judgment for the foreign state at its own request. This is an unfortunate declaration for this Court to make. It is, of course, wholly inconsistent with the premise from which the Court starts, and, under it, banishment of international law from the courts is complete and final in cases like this.  I cannot so cavalierly ignore the obligations of a court to dispense justice to the litigants before it.[17]

---

[16] "[D]iscriminatory laws enacted out of hatred, against aliens or against persons of any particular race or category or against persons belonging to specified social or political groups . . . run counter to the internationally accepted principle of the equality of individuals before the law." *Anglo-Iranian Oil Co.* v. *S. U. P. O. R. Co.*, [1955] Int'l L. Rep. 23, 40 (Civ. Ct. of Rome); see also Friedman, Expropriation In International Law (1953), 189–192; Wortley, Expropriation In Public International Law, 120–121 (1959); Cheng, The Rationale of Compensation for Expropriation, 44 Grotius Society 267, 281, 289 (1959); Seidl-Hohenveldern, Title to Confiscated Foreign Property and Public International Law, 56 Am. J. Int'l L. 507, 509–510 (1962).

[17] In the only reference in the Court's opinion to fairness between the litigants, and a court's obligation to resolve disputes justly, *ante*, p. 435, the Court quickly disposes of this consideration by assuming that the typical act of state case is between an original owner and an "innocent" purchaser, so that it is not unjust to leave the purchaser's title undisturbed by applying the act of state doctrine. Beside the obvious fact that this assumption is wholly inapplicable to the case where the foreign sovereign itself or its agent seeks to have its title validated in our courts—the case at bar—it is far from apparent that most cases represent suits between the original owner and an innocent purchaser.  The "innocence" of a purchaser who buys goods from a government with knowledge that possession or apparent title was derived from an act patently in violation of international law is highly questionable.  More fundamentally, doctrines of commercial law designed to protect the title of a bona fide purchaser can serve to resolve this question without reliance upon a broad irrebuttable presumption of validity.

## IV.

The reasons for nonreview, based as they are on traditional concepts of territorial sovereignty, lose much of their force when the foreign act of state is shown to be a violation of international law. All legitimate exercises of sovereign power, whether territorial or otherwise, should be exercised consistently with rules of international law, including those rules which mark the bounds of lawful state action against aliens or their property located within the territorial confines of the foreign state. Although a state may reasonably expect that the validity of its laws operating on property within its jurisdiction will not be defined by local notions of public policy of numerous other states (although a different situation may well be presented when courts of another state are asked to lend their enforcement machinery to effectuate the foreign act),[18] it cannot with impunity ignore the rules governing the conduct of all nations and expect that other nations and tribunals will view its acts as within the permissible scope of territorial sovereignty. Contrariwise, to refuse inquiry into the question of whether norms of the international community have been contravened by the act of state under review would seem to deny the existence or purport of such norms, a view that seems inconsistent with the role of international law in ordering the relations between nations. Finally, the impartial application of international law would not only be an

---

[18] Another situation was also presented by the Nazi decrees challenged in the *Bernstein* litigation; these racial and religious expropriations, while involving nationals of the foreign state and therefore customarily not cognizable under international law, had been condemned in multinational agreements and declarations as crimes against humanity. The acts could thus be measured in local courts against widely held principle rather than judged by the parochial views of the forum.

458

affirmation of the existence and binding effect of international rules of order, but also a refutation of the notion that this body of law consists of no more than the divergent and parochial views of the capital importing and exporting nations, the socialist and free-enterprise nations.

The Court puts these considerations to rest with the assumption that the decisions of the courts "of the world's major capital exporting country and principal exponent of the free enterprise system" would hardly be accepted as impartial expressions of sound legal principle. The assumption, if sound, would apply to any other problem arising from transactions that cross state lines and is tantamount to a declaration excusing this Court from any future consequential role in the clarification and application of international law. See *National City Bank of New York* v. *Republic of China,* 348 U. S. 356, 363. This declaration ignores the historic role which this Court and other American courts have played in applying and maintaining principles of international law.

Of course, there are many unsettled areas of international law, as there are of domestic law, and these areas present sensitive problems of accommodating the interests of nations that subscribe to divergent economic and political systems. It may be that certain nationalizations of property for a public purpose fall within this area. Also, it may be that domestic courts, as compared to international tribunals, or arbitral commissions, have a different and less active role to play in formulating new rules of international law or in choosing between rules not yet adhered to by any substantial group of nations. Where a clear violation of international law is not demonstrated, I would agree that principles of comity underlying the act of state doctrine warrant recognition and enforcement of the foreign act. But none of these considerations relieve a court of the obligation to make an

inquiry into the validity of the foreign act, none of them warrant a flat rule of no inquiry at all. The vice of the act of state doctrine as formulated by the Court and applied in this case, where the decree is alleged not only to be confiscatory but also retaliatory and discriminatory and has been found by two courts to be a flagrant violation of international law, is that it precludes any such examination and proscribes any decision on whether Cuban Law No. 851 contravenes an accepted principle of international law.

The other objections to reviewing the act challenged herein, save for the alleged interference with the executive's conduct of foreign affairs, seem without substance, both in theory and as applied to the facts of the instant case. The achievement of a minimum amount of stability and predictability in international commercial transactions is not assured by a rule of nonreviewability which permits any act of a foreign state, regardless of its validity under international law, to pass muster in the courts of other states. The very act of a foreign state against aliens which contravenes rules of international law, the purpose of which is to support and foster an order upon which people can rely, is at odds with the achievement of stability and predictability in international transactions. And the infrequency of cases in American courts involving foreign acts of state challenged as invalid under international law furnishes no basis at all for treating the matter as unimportant and for erecting the rule the Court announces today.[19]

---

[19] The Court argues that an international law exception to the act of state doctrine would fail to deter violations of international law, since judicial intervention would at best be sporadic. At the same time, proceeding on a contradictory assumption as to the impact of such an exception, the Court argues that the exception would render titles uncertain and upset the flow of international trade. The Court attempts to reconcile these conclusions by distinguishing between

There is also the contention that the act of state doctrine serves to channel these disputes through the processes designed to rectify wrongs of an international magnitude, see *Oetjen* v. *Central Leather Co., supra; Shapleigh* v. *Mier, supra.* The result of the doctrine, it is said, requires an alien to seek relief in the courts or through the executive of the expropriating country, to seek relief through diplomatic channels of his own country and to seek review in an international tribunal. These are factors an American court should consider when asked to examine a foreign act of state, although the availability and effectiveness of these modes of accommodation may more often be illusory than real. Where alternative modes are available and are likely to be effective, our courts might well stay their hand and direct a litigant to exhaust or attempt to utilize them before adjudicating the validity of the foreign act of state. But the possibility of alternative remedies, without more, is frail support for a rule of automatic deference to the foreign act in all cases. The Court's rule is peculiarly inappropriate in the instant case, where no one has argued that C. A. V. can obtain relief in the courts of Cuba, where the United States has broken off diplomatic relations with Cuba, and

---

"direct" and "indirect" impacts of a declaration of invalidity, and by assuming that the exporting nation need only find other buyers for its products at the same price. From the point of view of the exporting nation, the distinction between indirect and direct impact is meaningless, and the facile assumption that other buyers at the same price are available and the further unstated assumption that purchase price is the only pertinent consideration to the exporting country are based on an oversimplified view of international trade.

There is no evidence that either the absence of an act of state doctrine in the law of numerous European countries or the uncertainty of our own law on this question until today's decision has worked havoc with titles in international commerce or presented the nice questions the Court sets out on p. 434, n. 39, *ante,* or has substantially affected the flow of international commerce.

where the United States, although protesting the illegality of the Cuban decrees, has not sought to institute any action against Cuba in an international tribunal.

## V.

There remains for consideration the relationship between the act of state doctrine and the power of the executive over matters touching upon the foreign affairs of the Nation. It is urged that the act of state doctrine is a necessary corollary of the executive's authority to direct the foreign relations of the United States and accordingly any exception in the doctrine, even if limited to clear violations of international law, would impede or embarrass the executive in discharging his constitutional responsibilities. Thus, according to the Court, even if principles of comity do not preclude inquiry into the validity of a foreign act under international law, due regard for the executive function forbids such examination in the courts.

Without doubt political matters in the realm of foreign affairs are within the exclusive domain of the Executive Branch, as, for example, issues for which there are no available standards or which are textually committed by the Constitution to the executive.[20]  But this is far from saying that the Constitution vests in the executive exclusive absolute control of foreign affairs or that the validity of a foreign act of state is necessarily a political question. International law, as well as a treaty or executive agree-

---

[20] These issues include whether a foreign state exists or is recognized by the United States, *Gelston* v. *Hoyt,* 3 Wheat. 246; *The Sapphire,* 11 Wall. 164, 168; the status that a foreign state or its representatives shall have in this country (sovereign immunity), *Ex parte Muir,* 254 U. S. 522; *Ex parte Peru,* 318 U. S. 578; the territorial boundaries of a foreign state, *Jones* v. *United States,* 137 U. S. 202; and the authorization of its representatives for state-to-state negotiation, *Ex parte Hitz,* 111 U. S. 766; *In re Baiz,* 135 U. S. 403.

ment, see *United States* v. *Pink,* 315 U. S. 203, provides an ascertainable standard for adjudicating the validity of some foreign acts, and courts are competent to apply this body of law, notwithstanding that there may be some cases where comity dictates giving effect to the foreign act because it is not clearly condemned under generally accepted principles of international law. And it cannot be contended that the Constitution allocates this area to the exclusive jurisdiction of the executive, for the judicial power is expressly extended by that document to controversies between aliens and citizens or States, aliens and aliens, and foreign states and American citizens or States.

A valid statute, treaty or executive agreement could, I assume, confine the power of federal courts to review or award relief in respect of foreign acts or otherwise displace international law as the rule of decision. I would not disregard a declaration by the Secretary of State or the President that an adjudication in the courts of the validity of a foreign expropriation would impede relations between the United States and the foreign government or the settlement of the controversy through diplomatic channels. But I reject the presumption that these undesirable consequences would follow from adjudication in every case, regardless of the circumstances. Certainly the presumption is inappropriate here.

Soon after the promulgation of Cuban Law No. 851, the State Department of the United States delivered a note of protest to the Cuban Government declaring this nationalization law to be in violation of international law.[21] Since the nationalization of the property in ques-

---

[21] "[T]he Government of the United States considers this law to be manifestly in violation of those principles of international law which have long been accepted by the free countries of the West. It is in its essence discriminatory, arbitrary and confiscatory." Press Release No. 397, Dept. of State, July 16, 1960.

tion, the United States has broken off diplomatic relations with the present Government of Cuba. And in response to inquiries by counsel for the respondent in the instant case, officials of the State Department nowhere alleged that adjudication of the validity of the Cuban decree nationalizing C. A. V. would embarrass our relations with Cuba or impede settlement on an international level. In 1963, the United States Government issued a freeze order on all Cuban assets located in the United States. On these facts—although there may be others of which we are not aware—it is wholly unwarranted to assume that an examination of the validity of Cuban Law No. 851 and a finding of invalidity would intrude upon the relations between the United States and Cuba.

But the Court is moved by the spectre of another possibility; it is said that an examination of the validity of the Cuban law in this case might lead to a finding that the Act is not in violation of widely accepted international norms or that an adjudication here would require a similar examination in other more difficult cases, in one of which it would be found that the foreign law is not in breach of international law. The finding, either in this case or subsequent ones, that a foreign act does not violate widely accepted international principles, might differ from the executive's view of the act and international law, might thereby seriously impede the executive's functions in negotiating a settlement of the controversy and would therefore be inconsistent with the national interest. "[T]he very expression of judicial

The United States Ambassador to Cuba condemned this decree, stating to the Cuban Ministry of Foreign Relations:

"Under instructions from my government, I wish to express to Your Excellency the indignant protest of my government against this resolution and its effects upon the legitimate rights which American citizens have acquired under the laws of Cuba and under International Law." Press Release No. 441, Dept. of State, Aug. 9, 1960.

uncertainty might provide embarrassment to the Executive Branch." *Ante,* p. 433. These speculations, founded on the supposed impact of a judicial decision on diplomatic relations, seem contrary to the Court's view of the arsenal of weapons possessed by this country to make secure foreign investment and the "ample powers [of the political branches] to effect compensation," *ante,* p. 436, and wholly inconsistent with its view of the limited competence and knowledge of the judiciary in the area of foreign affairs and diplomacy. Moreover, the expression of uncertainty feared by the Court is inevitable under the Court's approach, as is well exemplified by the *ex-cathedra* pronouncements in the instant case. While premising that a judicial expression of uncertainty on whether a particular act clearly violates international law would be embarrassing to the executive, this Court, in this very case, announces as an underpinning of its decision that "[t]here are few if any issues in international law today on which opinion seems to be so divided as the limitations on a State's power to expropriate the property of aliens," and proceeds to demonstrate the absence of international standards by cataloguing the divergent views of the "capital exporting," "free enterprise" nations, of the "newly independent and underdeveloped countries," and of the "Communist countries" toward both the issue of expropriation and international law generally. The act of state doctrine formulated by the Court bars review in this case and will do so in all others involving expropriation of alien property precisely because of the lack of a consensus in the international community on rules of law governing foreign expropriations.[22] Contrariwise, it

---

[22] The Court disclaims saying that there is no governing international standard in this area, but only that the matter is not meet for adjudication. *Ante,* p. 429, n. 26. But since the Court's view is that there are only the divergent views of nations that subscribe to different ideologies and practical goals on "expropriations," the matter

would seem that the act of state doctrine will not apply to a foreign act if it concerns an area in which there is unusual agreement among nations, *ante,* p. 428, which is not the case with the broad area of expropriations.[23]   I fail to see how greater embarrassment flows from saying that the foreign act does not violate clear and widely accepted principles of international law than from saying, as the Court does, that nonexamination and validation are required because there are no widely accepted principles to which to subject the foreign act.[24]   As to potential

---

is not meet for adjudication, according to the Court, because of the lack of any agreement among nations on standards governing expropriations, *i. e.,* there is no international law in this area, but only the political views of the political branches of the various nations.

These assertions might find much more support in the authorities relied on by the Court and others if the issue under discussion was not the undefined category—expropriation—but the clearly discrete issue of adequate and effective compensation.   It strains credulity to accept the proposition that newly emerging nations or their spokesmen denounce all rules of state responsibility—reject international law in regard to foreign nationals generally—rather than reject the traditional rule of international law requiring prompt, adequate, and effective compensation.

[23] There is another implication in the Court's opinion: the act of state doctrine applies to all expropriations, not only because of the lack of a consensus among nations on any standards but because the issue of validity under international law "touches . . . the practical and ideological goals of the various members of the community of nations."   If this statement means something other than that there is no agreement on international standards governing expropriations, it must mean that the doctrine applies because the issue is important politically to the foreign state.   If this is what the Court means, the act of state doctrine has been expanded to unprecedented scope. No foreign act is subject to challenge where the foreign nation demonstrates that the act is in furtherance of its practical or ideological goals.   What foreign acts would not be so characterized?

[24] "A refusal of courts to consider foreign acts of State in the light of the law of nations is not . . . merely a neutral doctrine of abstention.   On the contrary the effect of such a doctrine is to lend the

embarrassment, the difference is semantic, but as to determining the issue on its merits and as to upholding a regime of law, the difference is vast.

There is a further possibility of embarrassment to the executive from the blanket presumption of validity applicable to all foreign expropriations, which the Court chooses to ignore, and which, in my view, is far more self-evident than those adduced by the Court. That embarrassment stems from the requirement that all courts, including this Court, approve, validate, and enforce any foreign act expropriating property, at the behest of the foreign state or a private suitor, regardless of whether the act arbitrarily discriminates against aliens on the basis of race, religion, or nationality, and regardless of the position the executive has taken in respect to the act. I would think that an adjudication by this Court that the foreign act, as to which the executive is protesting and attempting to secure relief for American citizens, is valid and beyond question enforcible in the courts of the United States would indeed prove embarrassing to the Executive Branch of our Government in many situations, much more so than a declaration of invalidity or a refusal to adjudicate the controversy at all. For the likelihood that validation and enforcement of a foreign act which is condemned by the executive will be inconsistent with national policy as well as the goals of the international community is great.[25] This result is precisely

full protection of the United States courts, police and governmental agencies to commercial property transactions which are contrary to the minimum standard of civilized conduct . . . ." The Association of the Bar of the City of New York, Committee on International Law, A Reconsideration of the Act of State Doctrine In United States Courts (1959), 8.

[25] That embarrassment results from a rigid rule of act of state immunity is well demonstrated by the judicial enforcement of German racial decrees after the war. The pronouncements by United States courts that these decrees vest title beyond question was wholly

because the Court, notwithstanding its protestations to the contrary, *ante,* p. 428, has laid down "an inflexible and all-encompassing rule in this case." [26]

## VI.

Obviously there are cases where an examination of the foreign act and declaration of invalidity or validity might

at odds with the executive's official policy, embodied in representations to other governments, that property taken through racial decrees by the Nazi Government should be returned to the original owners and thus not be subject to reparation claims. Compare statements by Secretary of State Marshall, reprinted in 16 Dept. State Bull. 653, 793 (1947), with *Bernstein* v. *Van Heyghen Freres Societe Anonyme,* 163 F. 2d 246 (C. A. 2d Cir.). This embarrassing divergence of governmental opinion was eliminated only after the executive intervened and requested the courts to adjudicate the matter on the merits. *Bernstein* v. *Nederlandsche-Amerikaansche Stoomvaart-Maatschappij,* 210 F. 2d 375 (C. A. 2d Cir.).

[26] It is difficult to reconcile the Court's statement that rules pertaining to expropriations are unsettled or unclear with the Court's pronounced desire to avoid making any statements on the proper or accepted principles of international law, lest it embarrass the executive, who may have a different view in respect to this particular expropriation or this particular expropriating country. Is not the Court's limitation of the act of state doctrine to the area of expropriations—based upon the uncertainty and fluidity of the governing law in this area—an admission that may prove to be embarrassing to the executive at some later date? And the very line-drawing that the Court stresses as potentially disruptive of the executive's conduct of foreign affairs is inevitable under the Court's approach, since subsequent cases not involving expropriations will require us to determine if the act of state doctrine applies and the Court's standard is the strength and clarity of the principles of international law thought to govern the issue. Again our view of the clarity of these principles and the extent to which they are really rules of international law may not be identical with the views of the Department of State. These are some of the inherent difficulties of establishing a rule of law on the basis of speculations about possible but unidentified embarrassment to the executive at some unknown and unknowable future date.

undermine the foreign policy of the Executive Branch and its attempts at negotiating a settlement for a nationalization of the property of Americans. The respect ordinarily due to a foreign state, as reflected in the decisions of this Court, rests upon a desire not to disturb the relations between countries and on a view that other means, more effective than piecemeal adjudications of claims arising out of a large-scale nationalization program of settling the dispute, may be available. Precisely because these considerations are more or less present, or absent, in any given situation and because the Department of our Government primarily responsible for the formulation of foreign policy and settling these matters on a state-to-state basis is more competent than courts to determine the extent to which they are involved, a blanket presumption of nonreview in each case is inappropriate and a requirement that the State Department render a determination after reasonable notice, in each case, is necessary. Such an examination would permit the Department to evaluate whether adjudication would "vex the peace of nations," whether a friendly foreign sovereign is involved, and whether settlement through diplomacy or through an international tribunal or arbitration is impending. Based upon such an evaluation, the Department may recommend to the court that adjudication should not proceed at the present time. Such a request I would accord considerable deference and I would not require a full statement of reasons underlying it. But I reject the contention that the recommendation itself would somehow impede the foreign relations of the United States or unduly burden the Department. The Court notes that "[a]dverse domestic consequences might flow from an official stand," by which I take it to mean that it might be politically embarrassing on the domestic front for the Department of State to interpose an objection

in a particular case which has attracted public attention. But an official stand is what the Department must take under the so-called *Bernstein* exception, which the Court declines to disapprove. Assuming that there is a difference between an express official objection to examination and the executive's refusal to relieve "the court from any constraint upon the exercise of its jurisdiction," it is not fair to allow the fate of a litigant to turn on the possible political embarrassment of the Department of State and it is not this Court's role to encourage or require nonexamination by bottoming a rule of law on the domestic public relations of the Department of State. The Court also rejects this procedure because it makes the examination of validity turn on an educated guess by the executive as to the probable result and such a guess might turn out to be erroneous. The United States in its brief has disclaimed any such interest in the result in these cases, either in the ultimate outcome or the determination of validity, and I would take the Government at its word in this matter, without second-guessing the wisdom of its view.

This is precisely the procedure that the Department of State adopted voluntarily in the situation where a foreign government seeks to invoke the defense of immunity in our courts.[27] If it is not unduly disruptive for

---

[27] The procedure was instituted as far back as *The Schooner Exchange* v. *McFaddon,* 7 Cranch 116 (1812), when a United States Attorney, on the initiative of the Executive Branch, entered an appearance in a case involving the immunity of a foreign vessel, and was further defined in *Ex parte Muir,* 254 U. S. 522, 533 (1921), when the Court stated that the request by the foreign suitor to the executive department was an acceptable and well-established manner of interposing a claim of immunity. Under the procedure outlined in *Muir* each of the contesting parties may raise the immunity issue by obtaining an official statement from the State Department, or by encouraging the executive to set forth appropriate suggestions

the Department to determine whether to issue a certificate of immunity to a foreign government itself when it seeks one, a recommendation by the Department in cases where generally the sovereign is not a party can hardly be deemed embarrassing to our foreign relations. Moreover, such a procedure would be consonant with the obligation of courts to adjudicate cases on the merits except for reasons wholly sufficient in the particular case. As I understand it, the executive has not yet said that adjudication in this case would impede his functions in the premises; rather he has asked us to adopt a rule of law foreclosing inquiry into the subject unless the executive affirmatively allows the courts to adjudicate on the merits.

Where the courts are requested to apply the act of state doctrine at the behest of the State Department, it does not follow that the courts are to proceed to adjudicate the action without examining the validity of the foreign act under international law. The foreign relations considerations and potential of embarrassment to the executive inhere in examination of the foreign act and in the result following from such an examination, not in the matter of who wins. Thus, all the Department of State can legitimately request is nonexamination of the foreign act. It has no proper interest or authority in having courts decide a controversy upon anything less than all of the applicable law or to decide it in accordance with the executive's view of the outcome that best comports with the foreign or domestic affairs of the day. We are not dealing here with those cases where a court refuses to measure a foreign statute against public policy of the forum or against the fundamental law of the foreign

to the Court through the Attorney General. See *Compania Espanola de Navegacion Maritima, S. A.,* v. *The Navemar,* 303 U. S. 68, 74. See generally Dickinson, The Law of Nations As National Law: "Political Questions," 104 U. of Pa. L. Rev. 451, 470–475 (1956).

state itself. In those cases the judicially created act of state doctrine is an aspect of the conflict of laws rules of the forum and renders the foreign law controlling. But where a court refuses to examine foreign law under principles of international law, which it is required to do, solely because the Executive Branch requests the court, for its own reasons, to abstain from deciding the controlling issue in the controversy, then in my view, the executive has removed the case from the realm of the law to the realm of politics, and a court must decline to proceed with the case. The proper disposition is to stay the proceedings until circumstances permit an adjudication or to dismiss the action where an adjudication within a reasonable time does not seem feasible. To do otherwise would not be in accordance with the obligation of courts to decide controversies justly and in accordance with the law applicable to the case.

It is argued that abstention in the case at bar would allow C. A. V. to retain possession of the proceeds from the sugar and would encourage wrongfully deprived owners to engage in devious conduct or "self-help" in order to compel the sovereign or one deriving title from it into the position of plaintiff. The short answer to this is that it begs the question; negotiation of the documents by Farr, Whitlock and retention of the proceeds by C. A. V. is unlawful if, but only if, Cuba acquired title to the shipment by virtue of the nationalization decree. This is the issue that cannot be decided in the case if deference to the State Department's recommendation is paid (assuming for the moment that such a recommendation has been made). Nor is it apparent that "self-help," if such it be deemed, in the form of refusing to recognize title derived from unlawful paramount force is disruptive of or contrary to a peaceful international order. Furthermore, a court has ample means at its disposal to prevent a party who has engaged in wrongful conduct from

setting up defenses which would allow him to profit from the wrongdoing. Where the act of state doctrine becomes a rule of judicial abstention rather than a rule of decision for the courts, the proper disposition is dismissal of the complaint or staying the litigation until the bar is lifted, regardless of who has possession of the property title to which is in dispute.

## VII.

The position of the Executive Branch of the Government charged with foreign affairs with respect to this case is not entirely clear. As I see it no specific objection by the Secretary of State to examination of the validity of Cuba's law has been interposed at any stage in these proceedings, which would ordinarily lead to an adjudication on the merits. Disclaiming, rightfully, I think, any interest in the outcome of the case, the United States has simply argued for a rule of nonexamination in every case, which literally, I suppose, includes this one. If my view had prevailed I would have stayed further resolution of the issues in this Court to afford the Department of State reasonable time to clarify its views in light of the opinion. In the absence of a specific objection to an examination of the validity of Cuba's law under international law, I would have proceeded to determine the issue and resolve this litigation on the merits.